CROWN EMAK PARTNERS, LLC,
Defendant/Counterclaim
Plaintiff, Appellant,

v.

Donald A. KURZ, Sems Diversified Value, LP, Lloyd M. Sems, Philip S. Kleweno, Michael Konig, and Take Back EMAK, LLC, Plaintiffs/Counterclaim Defendants, Appellees.

James L. Holbrook, Jr., Defendant Below, Appellant,

v.

Donald A. Kurz and Sems Diversified Value, LP, Plaintiffs Below, Appellees.

Nos. 64, 2010, 85, 2010.

Supreme Court of Delaware.

Submitted: March 31, 2010.

Decided: April 21, 2010.

Stephen E. Jenkins, Esquire (argued), Catherine A. Gaul, Esquire, and Andrew D. Cordo, Esquire, Ashby & Geddes, Wilmington, Delaware; Steven K. Talley, Esquire, Gibson, Dunn & Crutcher LLP, Denver, Colorado, for appellant, Crown EMAK Partners, LLC.

Collins J. Seitz, Jr., Esquire, and Bradley R. Aronstam, Esquire, Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware, for appellant, James L. Holbrook, Jr.

Andre G. Bouchard, Esquire and Joel Friedlander, Esquire (argued), Bouchard Margules & Friedlander, P.A., Wilmington, Delaware, for appellees Donald A. Kurz, Sems Diversified Value, LP, Lloyd M. Sems, Philip S. Kleweno, Michael Konig and Take Back EMAK, LLC.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice.

This is a consolidated appeal from a final judgment entered by the Court of Chancery pursuant to Rule 54(b). This proceeding involves competing requests for relief under section 225 of the Delaware General Corporation Law (the "DGCL").[1] At issue is which of two competing factions lawfully controls the board of directors (the "Board") of EMAK Worldwide, Inc. ("EMAK").

Prior to December 18, 2009, the Board had six directors and one vacancy. On December 18, one director resigned, creating a second vacancy. The plaintiffs-appellees contend that on December 20 and 21, Take Back EMAK, LLC ("TBE") delivered sufficient consents (the "TBE Consents") to remove two additional directors without cause, and fill three of the resulting vacancies with Philip Kleweno, Michael Konig, and Lloyd Sems. Incumbent director Donald A. Kurz ("Kurz") is a member of TBE. If valid, the TBE Consents would establish a new Board majority.

The defendants-appellants contend that on December 18, 2009, Crown EMAK Partners, LLC ("Crown") delivered sufficient consents (the "Crown Consents") to

---

1. Del.Code Ann. tit. 8, § 225 (Supp.2008).

amend EMAK's bylaws (the "Bylaw Amendments") in two important ways. First, the Crown Consents purportedly amended Section 3.1 of the Bylaws ("New Section 3.1") to reduce the size of the Board to three directors. Because Crown has the right to appoint two directors under the terms of EMAK's Series AA Preferred Stock, a by-law reducing the Board to three, if valid, would give Crown a Board majority. Second, the Crown Consents purportedly added a new Section 3.1.1 to the Bylaws ("New Section 3.1.1") providing that if the number of sitting directors exceeds three, then the EMAK CEO will call a special meeting of stockholders to elect the third director, who will take office as the singular successor to his multiple predecessors. The defendants contend that the Bylaw amendments are valid and that the next step is for the EMAK CEO to call a special meeting under New Section 3.1.1.

The Court of Chancery concluded that the TBE Consents validly effected corporate action and that, therefore, the lawful Board consists of incumbent directors Kurz, Jeffrey Deutschman, and Jason Ackerman, and newly elected directors Kleweno, Konig, and Sems. Consequently, one vacancy remains. The Court of Chancery also concluded that the bylaw amendments adopted through the Crown Consents conflict with the DGCL and are void. Therefore, the court held, the Crown Consents were ineffective either to reduce the size of the Board or to require the calling of a special meeting.

The appellants raise three claims in this appeal. First, the appellants submit that the Court of Chancery erred in concluding that Kurz did not engage in impermissible vote buying. In the alternative, they contend Kurz's purported purchase of the outcome determinative shares from Peter Boutros ("Boutros") was an improper transfer under the plain language of a Restricted Stock Grant Agreement between EMAK and Boutros. Second, they argue that the Court of Chancery erred when it held that Cede breakdowns should be deemed part of the "stock ledger" under title 8, section 219 of the Delaware Code with the result that the member depository banks and brokers are record holders. They submit that a proxy from DTC, as the only undisputed record holder of shares in "street name," was required to count the votes of those banks and brokers. Since TBE failed to obtain a proxy from DTC, those votes were invalid and improperly counted. Third, they argue that the Court of Chancery erred when it held that the Crown Consent was void because the amendments to the bylaws conflict with Delaware law.

We hold that Kurz did not engage in improper vote buying, but that his purchase of shares from Boutros was an improper transfer that was prohibited by a restricted stock agreement between Boutros and EMAK. Because the Boutros shares could not be voted, that deprived the Kurz faction of the votes required to elect their nominees. We therefore do not reach the issue of whether the Cede breakdowns are part of the "stock ledger" under title 8, section 291 of the Delaware Code. For reasons more fully discussed in this opinion, the Court of Chancery's interpretation of "stock ledger" under section 219 should be regarded as *obiter dictum* and without precedential effect. Finally, we hold that the Crown bylaw amendments were invalid because they conflict with Delaware law.

Therefore, the judgments of the Court of Chancery are affirmed in part and reversed in part. This matter is remanded for further proceedings in accordance with this opinion.

## Factual Background [2]

### EMAK's Capital Structure

EMAK is a Delaware corporation based in Los Angeles, California. EMAK has two classes of stock: common shares and the Series AA Preferred Stock.

EMAK has issued and outstanding 7,034,322 shares of common stock. EMAK's common shares traded on NAS-DAQ from 1994 until April 14, 2008, when trading was suspended. On June 17, 2008, EMAK was delisted. EMAK subsequently deregistered, although its common shares continue to trade on the pink sheets.

EMAK has issued and outstanding 25,000 shares of Series AA Preferred Stock, all held by Crown. The Series AA Preferred has the right to elect two directors to the Board, plus a third director if the Board expands to more than eight members. The Series AA Preferred does not vote in the election of directors. It does vote on an as-converted basis with the common stock on all other matters. The Series AA Preferred can convert into 2,777,777 common shares and carries 27.6% of EMAK's total voting power on matters where it votes with the common stock.

### TBE Consent Solicitation And Exchange Transaction

On Monday, October 12, 2009, TBE delivered an initial consent to EMAK, thereby launching its consent solicitation (the "TBE Consent Solicitation"). Under Section 2.13(c) of EMAK's bylaws (the "Bylaws"), the Board had the power to set a record date for the TBE Consent Solicitation. During a meeting held on October 19, the Board set October 22 as the record date. Had the Board not exercised its authority, the record date would have been October 12, the date of delivery of the initial TBE Consent.

At the October 19 meeting, the Board also approved a transaction in which Crown exchanged its Series AA Preferred for new Series B Preferred Stock (the "Exchange Transaction"). Unlike the Series AA Preferred, the Series B Preferred voted on an as-converted basis with the common stock on all matters, including the election of directors. The Exchange Transaction thus conferred on Crown the right to wield 27.6% of the total voting power in an election of directors. The October 22 record date enabled EMAK to place the new Series B Preferred into Crown's hands for the TBE Consent Solicitation.

On October 26, 2009, the plaintiffs filed suit challenging the Exchange Transaction and sought an expedited hearing on an application for preliminary injunction. During the scheduling conference, the parties agreed that the deadline for delivering consents in the TBE Consent Solicitation would be December 21, and the Court of Chancery entered an order implementing that agreement. The Court of Chancery granted the motion to expedite and scheduled a hearing on the plaintiffs' injunction application for December 4.

To bolster the defendants' litigation position, EMAK solicited consents to ratify the Exchange Transaction (the "Ratification Solicitation"). Ultimately, however, the Court of Chancery did not have to rule on either the Exchange Transaction or the ratification strategy because on December 3, 2009, the day before the hearing, EMAK and Crown rescinded the Exchange Transaction.

---

**2.** The underlying facts are not in dispute. This factual recitation is taken from the Court of Chancery's opinion dated February 9, 2010.

The plaintiffs responded to the rescission of the Exchange Transaction by filing an amended complaint challenging the disclosures made in the Ratification Solicitation. On December 7, 2009, the individual defendants and EMAK filed counterclaims and a third party complaint challenging the disclosures made in the TBE Consent Solicitation. On December 8, the parties agreed to defer litigating their disclosures and fight it out at the ballot box. They agreed to resume any litigation on December 22, after the deadline for the TBE Consent Solicitation.

### Three Simultaneous Consent Solicitations

During December 2009, solicitation activity intensified, because three simultaneous consent solicitations were under way. TBE continued its solicitation activities and issued a series of press releases and public statements in support of the TBE Consent Solicitation. On December 7, EMAK began soliciting consent revocations and issued a series of press releases and public statements in support of its efforts.

After the rescission of the Exchange Transaction, Crown designated Jason Ackerman as the second director authorized by the Series AA Preferred Stock. Then, Crown began soliciting consents to amend the Bylaws in the following manner:

RESOLVED: Article III, Section 3.1 of the Company's Bylaws is amended to read as follows:

Section 3.1. Number and Term of Office. The Board of Directors shall consist of three members. As provided for in the Amended and Restated Certificate of Designation of the Series AA Senior Cumulative Convertible Preferred Stock, two directors shall be elected by the holders of the Series AA Senior Cumulative Convertible Pre-

ferred Stock. The directors shall be elected at the annual meeting of the stockholders, except as provided elsewhere in this Article III, and each director elected shall hold office until his successor is elected and qualified. Directors need not be stockholders, residents of Delaware, or citizens of the United States.

RESOLVED: Article III, Section 3.1.1 is added to the Company's Bylaws:

Section 3.1.1 If at any time the number of members of the Board of Directors shall be greater than three, unless a sufficient number of directors resign to reduce the number of members of the Board of Directors to three, the Chief Executive Officer shall promptly call a special meeting of the common stockholders of the Corporation, which meeting shall be held not later than 20 days following the first date on which the number of directors was greater than three (or in the case of the adoption of the bylaw establishing a three-member Board of Directors, 20 days after such bylaw amendment became effective), for purposes of electing the one director to be elected by the common stockholders of the Corporation, who shall be the successor to all directors previously elected by the common stockholders of the Corporation.

In its opinion, the Court of Chancery referred to these provisions as the "Bylaw Amendments."

### DTC's And Broadridge's Roles in TBE Consent Solicitation

TBE conducted a broad-based solicitation in which it sought to obtain consents from a large number of individual EMAK stockholders. Since EMAK's shares were publicly traded for fourteen years, a significant number of EMAK stockholders owned their shares in "street name." This

practice is summarized in a leading treatise:

> The vast majority of publicly traded shares in the United States are registered on the companies' books not in the name of beneficial owners—*i.e.,* those investors who paid for, and have the right to vote and dispose of, the shares—but rather in the name of "Cede & Co.," the name used by The Depository Trust Company ("DTC").
>
> Shares registered in this manner are commonly referred to as being held in "street name." ... DTC holds the shares on behalf of banks and brokers, which in turn hold on behalf of their clients (who are the underlying beneficial owners or other intermediaries).[3]

The roles of DTC and the Investor Communications Solutions Division of Broadridge Financial Services, Inc. ("Broadridge") are important in this case. Broadridge's role has been summarized as follows:

> For many years, banks and brokers maintained their own proxy departments to handle the back-office administrative processes of distributing proxy materials and tabulating voting instructions from their clients. Today, however, the overwhelming majority have eliminated their proxy departments and subcontracted these processes out to [Broadridge]. For many years, these proxy processing services were provided by Automatic Data Processing, Inc. ("ADP"), but on March 31, 2007, ADP spun off its Brokerage Services Group into a new independent company, Broadridge, which now provides these services to most banks and brokers.

To make these arrangements work, Broadridge's bank and broker clients formally transfer to Broadridge the proxy authority they receive from DTC (via the [DTC] Omnibus Proxy) via written powers of attorney. On behalf of the brokers and banks, Broadridge delivers directly to each beneficial owner a proxy statement and, importantly, a voting instruction form (referred to as a "VIF") rather than a proxy card. Beneficial owners do not receive proxy cards because they are not vested with the right to vote shares or to grant proxy authority—those rights belong only to the legal owners (or their designees). Beneficial owners merely have the right to instruct how their shares are to be voted by Broadridge (attorney-in-fact of the DTC participants), which they accomplish by returning a VIF.[4]

DTC is generally regarded as the entity having the power under Delaware law to vote the shares that it holds on deposit for the banks and brokers who are members of DTC. Through the DTC omnibus proxy, DTC transfers its voting authority to those member banks and brokers. The banks and brokers then transfer the voting authority to Broadridge, which votes the shares held at DTC by each bank and broker in proportion to the aggregate voting instructions received from the ultimate beneficial owners.

For the TBE Consent Solicitation, Broadridge collected, recorded, and totaled the voting instructions it received from the beneficial owners of EMAK shares held in street name. There is no dispute that the banks and brokers properly authorized Broadridge to vote the EMAK shares held on their behalf by DTC.

---

**3.** John C. Wilcox, John J. Purcell III, & Hye-Won Choi, *"Street Name" Registration & The Proxy Solicitation Process* in Amy Goodman, et al., *A Practical Guide to SEC Proxy and* *Compensation Rules* 10–3 (4th ed. 2007 & 2008 Supp.).

**4.** *Id.* at 10–14.

What no one ever obtained, and what DTC never provided, was the DTC omnibus proxy. The evidence conflicts as to who had the responsibility to get the DTC omnibus proxy. The Court of Chancery found that neither party clearly had the obligation to secure the DTC omnibus proxy, although both could have done more, neither acted improperly or inequitably with respect to this aspect of the case.

### Delivery of the Consents

On December 18, 2009, Crown delivered the Crown Consents to EMAK, along with a certification required by Section 2.13(e) of the Bylaws attesting to Crown's good faith belief that Crown had received sufficient consents to take corporate action. Given the nearly 28% voting power that Crown could wield on matters other than the election of directors, Crown needed only another 23% to reach the necessary majority of EMAK's outstanding voting power. Crown obtained that majority from EMAK management and one large institutional holder. With only a few consents to deliver, Crown sidestepped the need for a DTC omnibus proxy by having DTC execute the consents in the name of Cede & Co., a procedure DTC offers to beneficial holders akin to the issuance of appraisal demands in Cede's name. This approach is not practical for a broad-based solicitation such as that which TBE conducted.

### Boutros Purchase Agreement

With the December 21, 2009, deadline looming, TBE and its principals were working feverishly to round up the final consents. On Thursday, December 17, Sems emailed Kurz: "We need to buy someone[s'] shares this weekend."

One person whose vote remained undecided was Boutros, a former employee and current consultant of EMAK who lived in Australia. Boutros owned 175,000 shares of restricted stock, all entitled to vote. Both sides sought Boutros's support. On Thursday, December 17, 2009, Boutros told Kurz that he would support Crown. Kurz responded that he would contact Boutros that weekend and encouraged Boutros to reconsider before the December 21 deadline.

As of Friday, December 18, 2009, D.F. King, TBE's proxy solicitor, showed TBE having consents for approximately 48.4% of the common shares. To prevail, TBE needed another 116,325 votes.

Between Friday, December 18 and Sunday, December 20, 2009, Kurz had a series of telephone calls with Boutros. On Sunday, Kurz had additional calls with Boutros's counsel. The result was a Purchase Agreement dated as of December 20, 2009 (the "Purchase Agreement"), in which Boutros sold to Kurz:

> (a) all shares of common stock of EMAK Worldwide, Inc., a Delaware corporation (the "*Company*") that Seller owns and is entitled or permitted to sell, transfer or assign as of the date hereof (the "*Shares*"), and (b) all rights to receive all other shares of the Company that the Seller is or may hereafter be entitled or permitted to sell, transfer or assign, for a total purchase price of U.S. $225,000.00 (the "*Purchase Price*"), with the Purchase Price to be paid by wire transfer to an account designated by Seller upon full execution of this Agreement.

Boutros originally asked for $2.25 per share. Kurz felt that was too high and bargained Boutros down. Kurz believed he obtained the economic and voting rights (albeit not legal title) to 150,000 shares, resulting in a price of $1.50 per share. At the time, EMAK's stock was trading on the pink sheets for around $0.95 per share.

The description of what Boutros sold and Kurz bought reflects their efforts to contract around transfer restrictions. A Restricted Stock Grant Agreement dated March 3, 2008, governed 150,000 of Boutros's shares. Section 2 of that Agreement provided: "Prior to [March 3, 2011], [Boutros] shall not be entitled to transfer, sell, pledge, hypothecate or assign any shares of Restricted Stock." Under Section 3 of that agreement, if Boutros was still employed by EMAK on March 3, 2011, then the transfer restrictions would lapse. If Boutros was terminated without cause before March 3, 2011, then the restrictions would lapse upon termination. If Boutros was terminated for cause or resigned before March 3, 2011, then he would forfeit the shares. The cover letter from EMAK that conveyed the grant stated: "The stock will vest equally (one-third per year) over a three year period." The Court of Chancery found that it was odd to use the term "vest," because under Section 2, the transfer restrictions and forfeiture provisions seemingly applied to all 150,000 shares until March 3, 2011.

Boutros' remaining 25,000 shares were governed by a Resale Restriction Agreement dated November 6, 2009. That latter agreement contains a different form of transfer restriction, which provides: "[Boutros] agrees not to sell, contract to sell, grant any option to purchase, transfer the economic risk of ownership in, make any short sale of, pledge or otherwise transfer or dispose of any Shares (or any interest in any Shares) until the Shares have been released from the foregoing restrictions [on or before November 7, 2010]."

The parties dispute what was actually transferred. Of the shares governed by the Restricted Stock Grant Agreement, the plaintiffs-appellees contended Boutros could transfer 50,000 shares immediately, another 50,000 on March 3, 2010, and the final 50,000 on March 3, 2011. The defendants-appellants contended Kurz got nothing and 150,000 shares if Boutros still holds them on March 3, 2011. For purposes of its opinion, the Court of Chancery assumed the latter to be true.

Section 2 of the Purchase Agreement was critical to Kurz. It provides:

> **Proxies.** As a material part of the consideration for this Agreement, and an express condition precedent to the effectiveness hereof, Seller agrees to execute and deliver to Buyer by facsimile transmittal on the date hereof, time being of the essence, with originals to follow immediately by express delivery, (a) this Agreement, (b) an Irrevocable Proxy, (c) the Revocation, and (d) the White Consent Card solicited by Take Back EMAK, LLC, each in the form attached hereto.

With Boutros' votes in hand, Kurz believed TBE had the consents it needed to prevail.

Late in the evening on December 20, 2009, Kurz's counsel sent by email to EMAK's general counsel an initial Broadridge omnibus consent dated November 23, 2009, reflecting voting instructions received through that date (the "Initial Broadridge Omnibus Consent"). Kurz's counsel also sent written consent cards for record holders and a certification attesting to the soliciting parties' good faith belief that they had received valid and unrevoked consents sufficient to take corporate action. The defendants-appellants question whether Kurz, TBE, and the other soliciting parties could have held that good faith belief on December 20. The Court of Chancery found that the certification was properly given, based on the consents TBE had in hand and the information TBE had from its proxy solicitor about how the street name vote came in.

On the morning of December 21, 2009, the same documents were hand-delivered to EMAK's registered office in Delaware. That morning, TBE ordered a supplemental omnibus consent from Broadridge dated December 21, 2009 (the "Supplemental Broadridge Omnibus Consent"), showing additional votes, net of revocations, since November 23. The Supplemental Broadridge Omnibus Consent was hand-delivered to EMAK's registered office later that day. TBE also delivered additional consent cards from registered holders to EMAK's registered office.

### The IVS Reports

On December 21, 2009, IVS issued its preliminary tabulation report on the Crown Consents. IVS reported that Crown had delivered consents representing 50.89% of EMAK's outstanding voting power, sufficient to amend the Bylaws. On December 23, EMAK informed IVS that it was not challenging the preliminary tabulation report. That same day, IVS issued its final report confirming its preliminary tally.

On December 23, 2009, IVS issued its preliminary tabulation report on the TBE Consents. IVS reported that record holders of 2,496,598 shares expressed consent in favor of the TBE Consent Solicitation and that street name holders of 1,055,815 shares consented through the Broadridge omnibus consents. The combined tally of 3,552,413 shares represented a majority of the 7,034,322 common shares outstanding on the record date. The IVS preliminary report, however, treated the street votes as "invalid due to the lack of a DTC omnibus proxy on file."

On January 14, 2010, TBE delivered a written challenge to the IVS preliminary report. TBE contended that (i) the consents for shares held in street name should be counted and (ii) the tally in favor of TBE should include additional consents delivered on December 21, 2009.

On January 15, 2010, IVS issued its final report. IVS revised its tally to take into account consent cards delivered on December 21, 2009, and now reported that record holders of 2,502,032 shares expressed consents in favor of the TBE Consent Solicitation. IVS declined to count the street name consents, however.

As of October 22, 2009, EMAK had 7,034,322 shares outstanding. In order to prevail, TBE needed to obtain consents for 3,517,162 shares (50% + 1). Backing out the consents for 2,502,032 shares that TBE received from record holders would leave a balance of 1,015,130 votes required for victory.

The IVS preliminary report showed that TBE received consents from street name holders of 1,055,815 shares, which was more than sufficient. Table A shows for each proposal (i) the votes received by TBE through the Initial Broadridge Omnibus Consent and (ii) the additional votes, net of revocations, received by TBE through the Supplemental Broadridge Omnibus Consent. On each issue, the Broadridge omnibus consents provided TBE with sufficient votes from shares held in street name for TBE to prevail.

**TABLE A**

| Issue | Initial Broadridge Omnibus Consent | Supplemental Broadridge Omnibus Consent | Total |
|---|---|---|---|
| Removal of incumbent directors | 1,055,815 | 3,144 | 1,058,959 |
| Elect Kleweno | 1,055,965 | 4,634 | 1,060,599 |

| | | | |
|---|---|---|---|
| Elect Konig | 1,055,965 | 2,287 | 1,058,252 |
| Elect Sems | 1,055,965 | 2,287 | 1,058,252 |

But there was one more step in the process. The sequence of events at the beginning of the TBE Consent Solicitation created confusion about what was the record date. TBE first delivered a consent that would have set October 12, 2009 as the record date, but then the Board exercised its authority to set the record date for October 22. The Broadridge omnibus consents reflected an incorrect record date of October 12. The Court of Chancery ruled that a consent need not identify the record date, and the fact that Broadridge included an incorrect piece of extraneous information on its omnibus consents did not affect their validity.

The Court of Chancery found it necessary, however, to review the number of shares voted by the Broadridge omnibus consents and count only the number of shares actually held by the banks and brokers on the true record date of October 22, 2009. If DTC holds shares of a corporation on behalf of banks and brokers, then the corporation can ask DTC to provide what is technically known as a participant listing and informally referred to as a "Cede breakdown." The Cede breakdown for a particular date identifies by name each bank or broker that holds shares with DTC as of that date and the number of shares held, respectively, by each. In contrast to the DTC omnibus proxy, which is not governed by any legal authority, federal regulations require DTC to furnish a Cede breakdown promptly when an issuer corporation requests it.

In November 2009, EMAK obtained Cede breakdowns for both October 12 and October 22. The Cede breakdowns show the aggregate decline in the share positions of each of the thirty-one banks and brokers who held EMAK shares through DTC. The total reduction was 29,386 shares, less than the margin of victory on each issue. (The same calculation can be derived by cutting back the overvote on a broker-by-broker basis.) Assuming conservatively that even if TBE lost one consent for each share by which the position of a consenting bank or broker declined, TBE still prevailed. Table B shows the calculations.

**TABLE B**

| Issue | Total Street Votes From Broadridge Omnibus Consents | Total Votes After Reduction of 29,386 Shares | Margin of Victory Based On 1,015,130 Street Votes Needed |
|---|---|---|---|
| Removal of incumbent directors | 1,058,959 | 1,029,573 | 14,443 |
| Elect Kleweno | 1,060,599 | 1,031,213 | 16,083 |
| Elect Konig | 1,058,252 | 1,028,866 | 13,736 |
| Elect Sems | 1,058,252 | 1,028,866 | 13,736 |

The Court of Chancery found, as fact, that if all of the TBE Consents are counted, including the street votes from the Broadridge omnibus consents, then TBE delivered sufficient consents to EMAK to take valid corporate action.

## Analysis

### Improper Vote Buying Concern

Shareholder voting differs from voting in public elections, in that the shares on which the shareholders' vote depends can be bought and sold.[5] Vote buying in the context of corporate elections and other shareholder actions has been and continues to be an important issue.[6] Several commentators have addressed the corporate voting process and techniques by which shareholder voting rights can be manipulated.[7]

The Court of Chancery characterized vote buying that does not involve the use of corporate resources as "third party vote buying." Here, although Kurz is a director of EMAK, he used his own resources to acquire Boutros's shares. Accordingly, Kurz's actions as a third party do not involve the problem of insiders using corporate resources to "buy" votes.[8]

Vote buying has been described as disenfranchising when it delivers the swing votes.[9] In this case, the Court of Chancery opined that third party vote buying merits judicial review if it is disenfranchis-ing, i.e., if it actually affects the outcome of the vote.[10] Applying those principles to this case, the Court of Chancery concluded that the Purchase Agreement between Kurz and Boutros was potentially disenfranchising and "should be subjected to a vote buying analysis," because the "Purchase Agreement provided TBE with the votes they [sic] needed to prevail and disenfranchised what would have been a silent majority against the TBE Consent Solicitation." Therefore, it determined that the Purchase Agreement should be scrutinized closely.

The Court of Chancery noted a 1983 scholarly analysis of shareholder voting which concluded "[i]t is not possible to separate the voting right from the equity interest" and that "[s]omeone who wants to buy a vote must buy the stock too." [11] The Court of Chancery also recognized, however, that over the last twenty-five years "[i]nnovations in technology and finance have made it easier to separate voting from the financial claims of shares." [12] Today, "the market permits providers to slice and dice the shareholder's interest in a variety of ways, and investors are willing

---

**5.** Robert B. Thompson & Paul H. Edelman, *Corporate Voting*, 62 Vand. L.Rev. 129, 130 (2009).

**6.** *See, e.g.*, Saul Levmore, *Voting With Intensity*, 53 Stan. L.Rev. 111, 136–39 (2000); Robert B. Thompson & Paul H. Edelman, *Corporate Voting*, 62 Vand. L.Rev. 129 (2009).

**7.** *See, e.g.*, Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms*, 61 Bus. Law. 1011 (2006) (hereinafter *Empty Voting)*; Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions*, 156 U. Pa. L.Rev. 625 (2008); Marcel Kahan & Edward B. Rock, *Hedge Funds in Corporate Governance And Corporate Control*, 155 U. Pa. L.Rev. 1021 (2007).

**8.** *See Portnoy v. Cryo–Cell Int'l, Inc.*, 940 A.2d 43, 73–74 (Del.Ch.2008); *Hewlett v. Hewlett–Packard Co.*, 2002 WL 549137, at \*4–7 (Del. Ch. Apr.8, 2002); *Kass v. E. Air Lines, Inc.*, 1986 WL 13008, at \*2–4 (Del.Ch. Nov. 14, 1986); *Schreiber v. Carney*, 447 A.2d 17, 22–23 (Del.Ch.1982).

**9.** *Hewlett v. Hewlett–Packard Co.*, 2002 WL 549137, at \*5.

**10.** *See Schreiber v. Carney*, 447 A.2d at 25–26.

**11.** Frank H. Easterbrook & Daniel R. Fischel, *Voting in Corporate Law*, 26 J.L. & Econ. 395, 410 (1983).

**12.** Robert B. Thompson & Paul H. Edelman, *Corporate Voting*, 62 Vand. L.Rev. 129, 153 (2009).

to buy these separate interests." [13]

According to a recent scholarly study of corporate voting by Professors Robert Thompson and Paul Edelman, a disconnect between voting rights and the economic interests of shares "compromises the ability of voting to perform its assigned role." [14] They concluded that "[a] decision-making system that relies on votes to determine the decision of the group necessarily requires that the voters' interest be aligned with the collective interest. [Therefore, i]t remains important to require an alignment between share voting and the financial interest of the shares." [15]

### No Improper Vote Buying

For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares. As then Vice–Chancellor (now Chief Justice) Steele explained, "[g]enerally speaking, courts closely scrutinize vote-buying because a shareholder who divorces property interest from voting interest[ ] fails to serve the 'community of interest' among all shareholders, since the 'bought' shareholder votes may not reflect rational, economic self-interest arguably common to all shareholders." [16] Again, in this case, the Court of Chancery recognized that "[w]hat legiti-

mizes the stockholder vote as a decision-making mechanism is the premise that stockholders with economic ownership are expressing their collective view as to whether a particular course of action serves the corporate goal of stockholder wealth maximization." [17]

■ Accordingly, the Court of Chancery held that "[p]olicing third-party vote buying does not rest on the outdated notion that every stockholder owes every other stockholder a duty to use its best judgment while voting. It flows instead from the legitimating conditions necessary for meaningful stockholder voting.·...." The Court of Chancery concluded that:

Because transactions in which economic interests are fully aligned with voting rights do not raise concern, Delaware law does not restrict a soliciting party from buying shares and getting a proxy to bolster the solicitation's chance of success. Delaware law presumes that in the sale of the underlying stock, the seller sells and assigns all of its rights, title and interest, "including its right to grant a consent or a revocation with respect to a past record date...." *Commonwealth Assocs. v. Providence Health Care*, 641 A.2d at 158. Delaware law further presumes that "upon request the seller will, in good faith, take such

13. *Id.*

14. *Id.*

15. *Id.* at 174

16. *In re IXC Commc's, Inc. S'holders Litig.*, 1999 WL 1009174, at *8 (Del.Ch. Oct. 27, 1999); *see also Haft v. Haft*, 671 A.2d 413, 421 (Del.Ch.1995) ("A powerful argument can be advanced that generally the congruence of the right to vote and the residual rights of ownership will tend towards efficient wealth production."); *Commonwealth Assocs. v. Providence Health Care*, 641 A.2d 155, 157 (Del.Ch.1993) (noting law's historic concern about "the sale of votes unconnected to the

sale of stock" in part because "such sales misalign the interests of voters and the interests of the residual corporate risk bearers").

17. A Delaware public policy of guarding against the decoupling of economic ownership from voting power can be seen in the 2009 amendment to section 213(a), which now authorizes a board to set one record date for purposes of giving notice of a meeting of stockholders and a second, later record date for determining which stockholders can vote at the meeting. Del.Code Ann. tit. 8, § 213(a) (West Supp.2010).

ministerial steps as are necessary (*e.g.,* granting proxies) to effectuate the transfer." *Id.* Such transactions are common. John C. Wilcox, John J. Purcell III, & Hye–Won Choi, *"Street Name" Registration & The Proxy Solicitation Process,* at 10–26 in Amy Goodman, et al., *A Practical Guide to SEC Proxy and Compensation Rules* (4th Ed. 2007 & 2008 Supp.) ("[O]ver the course of a proxy contest, it is not uncommon for contestants to attempt to increase their voting power by purchasing additional shares...."); Robert B. Thompson & Paul H. Edelman, *Corporate Voting,* 62 Vand. L.Rev. 129, 130 (2009) ("A corporate voter who has intense feelings about the matter to be determined can influence, if not control, the outcome by purchasing shares.").

Guided by these principles, the Court of Chancery scrutinized the Purchase Agreement as follows:

I find no evidence of fraud in the transaction. The record indicates that Boutros was fully informed about the ongoing consent solicitations. Both factions had made multiple attempts to get him to commit to their side. Although there is no direct evidence establishing that Boutros knew his shares were the swing shares, I conclude that he must have been cognizant of this fact. He cut his deal with Kurz over the weekend before the Monday on which the TBE Consent Solicitation ended. At a time when EMAK's stock was trading on the pink sheets for less than a dollar, Boutros asked for $2.25 per share and received $1.50 per share. Boutros was advised by counsel and bargained to obtain specific terms for the deal, including an absence of representations and warranties and contractual indemnification from Kurz. These are the hallmarks of a transaction in which Boutros understood what he was selling, the circumstances under which he was selling it, and what he was getting in return.

This brings me to the *alignment of interests.* Although Kurz did not take title to the 150,000 shares that Boutros owned, and although I assume the Restricted Stock Grant Agreement prohibits Boutros from transferring title to Kurz until March 3, 2011, Boutros nevertheless transferred to Kurz, and *Kurz now bears, 100% of the economic risk* from the 150,000 shares. If the value of EMAK's shares drops further, then Kurz will suffer. If EMAK goes bankrupt and its shares become worthless, then Kurz will have a paper souvenir. Conversely, if EMAK turns itself around and prospers, then Kurz will benefit. Kurz has already paid Boutros. Kurz's only interest lies in how EMAK performs.

*Because Kurz now holds the economic interest in the shares, Delaware law presumes that he should and will exercise the right to vote.* Commonwealth *Assocs. v. Providence Health Care,* 641 A.2d at 158; *see Len v. Fuller,* 1997 WL 305833, at *5 (Del.Ch. May 30, 1997) (barring record holder from voting shares by written consent after corporation exercised option to acquire shares); *Freeman v. Fabiniak,* 1985 WL 11583, at *7 (Del.Ch. Aug.15, 1985) ("[I]t would be inequitable to allow a holder of record who holds mere legal title to stock to act by consent in a manner contrary to the wishes of the true owner."). The proxy Boutros granted to Kurz under the Purchase Agreement comports with what our law expects. *See generally* John C. Wilcox, John J. Purcell III, & Hye–Won Choi, *"Street Name" Registration & The Proxy Solicitation Process* at 10–27 in Amy Goodman, et al., *A Practical Guide to SEC Proxy and Compensation Rules* 10–3 (4th ed. 2007

& 2008 Supp.) (explaining that a purchaser typically obtains an irrevocable proxy when shares are acquired from a registered holder).[18]

We hold that the Court of Chancery correctly concluded that there was no improper vote buying, because the economic interests and the voting interests of the shares remained aligned since both sets of interests were transferred from Boutros to Kurz by the Purchase Agreement.

### Restricted Stock Grant Agreement Violated

The defendants-appellants next argue that, even if the Purchase Agreement did not constitute improper vote buying, Kurz should not be allowed to vote the Boutros shares, because by entering into the Purchase Agreement, Boutros breached the transfer restrictions in the Restricted Stock Grant Agreement. The Restricted Stock Grant Agreement provided that "[p]rior to [March 3, 2011], [Boutros] shall not be entitled to transfer, sell, pledge, hypothecate or assign any shares of Restricted Stock." The Court of Chancery assumed that the restrictions are operative and binding.

The factual findings made by the Court of Chancery are important. On Thursday, December 17, 2009, Kurz was told "we need to *buy* someone's shares this weekend." As of Friday, TBE had consents for approximately 48.4% of the common shares and needed another 116,325 votes to prevail. Boutros owned 175,000 shares of restricted stock, all of which were all entitled to vote. Kurz was provided with copies of both of Boutros' stock restriction agreements on Sunday, December 20, 2009, before entering into the Purchase Agreement.

Kurz read the agreements and parsed the restrictions. He focused on the language in the Resale Restriction Agreement that extended beyond any sale to encompass any "contract to sell," any "option to purchase," and any transfer of the "economic risk of ownership." He noted that the Restricted Stock Grant Agreement did not contain similar language and appeared to restrict only an actual sale, transfer, pledge, hypothecation, or assignment. Kurz concluded that he could contract with Boutros to buy however many shares Boutros could sell at the time, and to obtain in the future however many shares Boutros eventually could transfer, if and when Boutros became able to transfer them.

The Court of Chancery held that Kurz and Boutros had successfully contracted around the sale and transfer restrictions, because the Restricted Stock Grant Agreement does not prohibit Boutros from agreeing to take those actions *at a future date*. The record supports the Court of Chancery's conclusion that Kurz did not engage in illegal vote buying because that court found that, along with the votes, Kurz simultaneously purchased and immediately received the *full economic* interests associated with the Boutros shares. That finding, however, leads inexorably to the conclusion that the Purchase Agreement violated the Restricted Stock Grant Agreement. The Court of Chancery's determination that there was no actual sale or transfer is not supported by the record, the language and purpose of the Restricted Stock Grant Agreement, or the court's own findings.

In their comprehensive analysis of new vote buying and its corporate governance implications, Professors Henry Hu and Bernard Black have examined modern

18. (emphasis added).

vote buying techniques. In doing so they defined three terms that are relevant to our review of what was *actually transferred immediately* by the Purchase Agreement between Kurz and Boutros.

"[F]ormal voting rights" [—] the *legal* right to vote shares under company law (as supplemented by SEC and stock exchange rules governing voting of shares held in street name), including the legal power to instruct someone else how to vote.

"[E]conomic ownership" [—] the economic returns associated with shares. This ownership can be achieved directly by holding shares, or indirectly by holding a "coupled asset," which conveys returns that relate directly to the returns on the shares. Economic ownership can either be positive—the same direction as the return on shares—or negative—the opposite direction from the return on shares.

"Full ownership" consist[s] of voting ownership plus direct economic ownership.[19]

Professors Hu and Black also noted:

Our system of record ownership already decouples economic ownership from formal voting rights. The record owner is typically at least two persons removed from the economic owner of the shares. Shares held in "street name" are generally held "of record" by Depository Trust Company or another securities depository, which holds the shares on behalf of another intermediary (such as a broker-dealer or bank), which holds the shares for economic owners. Our legal system has responded by partly recoupling voting and economic ownership. Depositories pass voting rights to their bank and broker clients, who must request voting instructions from economic owners. If the customer does not provide instructions, New York Stock Exchange (NYSE) Rule 452 allows a bank or broker to vote on routine matters, but not on a contested matter or on a merger or similar transaction which may substantially affect the value of the shares.[20]

Professors Hu and Black concluded that the foregoing rules on when record owners can vote provide precedent for an effort to reconnect voting rights to economic ownership, when technology has severed them.

Those observations helpfully aid our analysis of the Purchase Agreement. Kurz paid Boutros for the immediate receipt of all economic interest in the shares. The Restricted Stock Grant Agreement, however, required the continued decoupling of the formal voting rights, by requiring that Boutros remain as the record owner until 2011. Nevertheless, Kurz was able to connect the economic rights he purchased from Boutros with the formal voting rights that Boutros would otherwise retain by requiring Boutros to execute an Irrevocable Proxy.

Therefore, unlike other beneficial owners, Kurz could vote the shares on any future corporate matter without ever again contacting the record owner, Boutros, for another proxy. By reconnecting the voting rights to the economic ownership via the Irrevocable Proxy, the Purchase Agreement *immediately* conferred upon Kurz the functional equivalent of "full ownership," in consideration for the $225,000 he paid to Boutros. There was nothing for Boutros to transfer to Kurz in the future, other than the bare legal title.

---

19. Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms*, 61 Bus. Law. 1011, 1022 (2006).

20. *Id.* at 1058 (internal citations omitted).

The Court of Chancery found that "Kurz believed he obtained the economic and voting rights (albeit not legal title) to 150,000 shares" for a price of $1.50 per share. Kurz testified that when he entered into the Purchase Agreement, the financial results and forecasts he received suggested he was *overpaying Boutros for his shares.* In rejecting the defendants' insider trading arguments,[21] the Court of Chancery concluded that Kurz's testimony was credible and that "Kurz *bought Boutros' shares* because TBE needed another 116,325 votes to win."

The purpose of the Restricted Stock Grant Agreement was to "provid[e] employees and consultants of [EMAK] with a proprietary interest in pursuing the long-term growth, profitability and financial success of the Corporation." That is consistent with the purpose of restricted stock agreements generally.[22] The structure of the Restricted Stock Agreement, providing that Restricted Stock will fully vest in Boutros only after three years of continued employment beyond the grant date, is also consistent with this purpose.

The Court of Chancery found that "although Kurz did not take title to the 150,000 shares that Boutros owned, and although I assume the Restricted Stock Grant Agreement prohibits Boutros from transferring title to Kurz until March 3, 2011, Boutros nevertheless transferred to Kurz, and Kurz now bears, 100% of the economic risk from the 150,000 shares." Boutros' immediate divestiture of all voting and economic rights in his shares frustrates the purpose of the Restricted Stock Grant Agreement, because bare legal title, alone and without more, does not give Boutros a stake in the corporation's future.

The Restricted Stock Agreement prohibits any "transfer, [sale], pledge or hypothecat[ion]" of Boutros' restricted EMAK shares. The Court of Chancery found that the "odd framing of what Boutros sold and Kurz bought reflects their efforts to contract around those transfer restrictions."[23] The Boutros/Kurz Purchase Agreement recites that Boutros agrees to "sell" all shares "that he owns and is permitted to sell, transfer or assign...." By its very terms, the Restricted Stock Grant Agreement prohibits what the Boutros/Kurz Purchase Agreement purports to do, *i.e.,* sell, transfer or assign his shares. Therefore, we hold that the Purchase Agreement did not operate as a legally valid sale or transfer of Boutros' shares, and that Kurz was not entitled to vote those shares.

### Written Consent Must Be Executed by a Record Holder

The defendants also argue the TBE Consents cannot be effective because of

---

21. In this appeal, it is unnecessary to address either the defendants' insider trading theory or Kurz's violation of EMAK's insider trading policy. Although the Court of Chancery characterized those arguments as theoretical and highly technical, in our view, an actual finding of insider trading violations requires an appropriate remedy.

22. *See* Andrew C.W. Lund, *What was the Question? The NYSE and NASDAQ's Curious Listing Standards Requiring Shareholder Approval of Equity–Compensation Plans,* 39 Conn. L.Rev. 119, 127–28 (2006).

23. The record clearly reflects Boutros' concern about whether the Purchase Agreement successfully circumvented the prohibitions in the Restricted Stock Grant Agreement. The Court of Chancery found: "Boutros asked for $2.25 per share and received $1.50 per share. Boutros was advised by counsel and bargained to obtain specific terms for the deal, including an absence of representations and warranties and contractual indemnification from Kurz. These are the hallmarks of a transaction in which Boutros understood what he was selling, the circumstances under which he was selling it, and what he was getting in return."

the absence of a DTC omnibus proxy. Section 228(a) of the DGCL provides:

> Unless otherwise provided in the certificate of incorporation, any action required by this chapter to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed *by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted* and shall be delivered to the corporation by delivery to its registered office in this State, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.[24]

Section 228(c) requires that each consent "bear the date of signature of each stockholder" and that to be effective, consents "signed by a sufficient number of holders" must be delivered to the corporation "within 60 days of the earliest dated consent." [25]

In the Court of Chancery, the plaintiffs' initial response to the lack of a DTC omnibus proxy was to argue that a written consent need not be executed by a stockholder of record. In two decisions, *Freeman v. Fabiniak*[26] and *Grynberg v. Burke,*[27] the Court of Chancery previously held that only a stockholder of record can execute a written consent. The plaintiffs asked the Court of Chancery not to follow the holdings in those prior opinions, which the plaintiffs contend "betray an unfounded hostility towards the then-novel use of written consents in control contests and an unjustified preference for the traditional stockholder meeting." [28] In this case, the Court of Chancery rejected the plaintiffs' arguments "both as a matter of statutory analysis and for policy reasons." Instead it adhered to the holdings of *Freeman* and *Grynberg* that only a stockholder of record can execute a written consent.

Section 219(c) of the DGCL provides that "[t]he stock ledger shall be the only evidence as to who are the stockholders entitled by this section ... to vote in person or by proxy at any meeting of stockholders." [29] "The ledger is a compilation of the transfers by and to each individual shareholder, with each transaction separately posted to separately maintained shareholder accounts." [30] The ledger is different from a stocklist, which is "a compilation of the currently effective entries in the stock ledger." [31] Under Section 219(a),

---

24. Del.Code Ann. tit. 8, § 228(a) (2001) (emphasis added).

25. Del.Code Ann. tit. 8, § 228(c) (2001).

26. *Freeman v. Fabiniak*, 1985 WL 11583 (Del. Ch. Aug. 15, 1985).

27. *Grynberg v. Burke*, 1981 WL 17034 (Del. Ch. Aug. 31, 1981).

28. *See Freeman v. Fabiniak*, 1985 WL 11583, at *5 (describing Section 228 as "an undesirable vehicle to resolve the dispute between the two factions"); *Grynberg v. Burke*, 1981 WL 17034, at *6 (describing Section 228 as "obviously designed to facilitate shareholder action where the outcome is a foregone conclusion" and suggesting that the difficulties presented by the case "could have been avoided at a noticed meeting").

29. Del.Code Ann. tit. 8, § 219(c) (Supp.2008).

30. 2 David A. Drexler et al., Delaware Corporate Law and Practice, § 25.03 at 25–7 (2009).

31. *Id.*

"at least 10 days before every meeting of stockholders," the officer in charge of the stock ledger must "prepare and make ... a complete list of the stockholders entitled to vote at the meeting."[32]

More than fifty years ago, this Court held that only registered stockholders may exercise the power to vote in a Delaware corporation.[33] In the *American Hardware* case, Savage Arms sought stockholder approval of a stock-for-stock acquisition and sent out the notice of meeting and proxy statement sixteen days before the meeting date. American Hardware objected, arguing that "because one-third of the outstanding shares were held in brokers' accounts, the time allowed for all the stockholders to receive and consider the opposition's proxy material was insufficient."[34] This Court rejected that argument, stating that "[t]he answer to this point is simple."[35]

> Under the General Corporation Law, no one but a registered stockholder is, as a matter of right, entitled to vote, with certain exceptions not pertinent here.

If an owner of stock chooses to register his shares in the name of a nominee, he takes the risks attendant upon such an arrangement, including the risk that he may not receive notice of corporate proceedings, or be able to obtain a proxy from his nominee. The corporation, except in special cases, is entitled to recognize the exclusive right of the registered owner to vote.... The corporation has ordinarily discharged its obligation under Delaware law when it mails notice to the record owner.[36]

Section 228(a) incorporates the concept of record ownership that governs voting at a meeting of stockholders by framing the taking of action by written consent in terms of the holders of outstanding stock who would have sufficient votes to take similar action at a meeting where all shares entitled to vote are present. In this case, the Court of Chancery held "section 228 is thus appropriately interpreted as requiring that a written consent be executed by a stockholder of record." The Court of Chancery also relied on section

---

**32.** Del.Code Ann. tit. 8, § 219(a) (West Supp. 2010).

**33.** *Am. Hardware Corp. v. Savage Arms Corp.,* 136 A.2d 690, 692 (Del.1957); *accord In re Giant Portland Cement Co.,* 21 A.2d 697, 701 (Del.Ch.1941) ("The right to vote shares of corporate stock, having voting powers, has always been incident to its legal ownership."); *Atterbury v. Consol. Coppermines Corp.,* 20 A.2d 743, 749 (Del.Ch.1941) ("[T]he corporation will recognize the registered owner as the true owner....").

**34.** *Am. Hardware Corp. v. Savage Arms Corp.,* 136 A.2d at 692.

**35.** *Id.*

**36.** *Id.* (footnote and internal citations omitted). Subsequent decisions have consistently limited the right to vote to record holders. *See, e.g., Shaw v. Agri–Mark, Inc.,* 663 A.2d 464, 469 (Del.1995) (recognizing the "long-established rule that a corporation may rely on its stock ledger in determining which stockholders are eligible to vote"); *Berlin v. Emerald Partners,* 552 A.2d 482, 494 (Del. 1988) ("Delaware law expressly recognizes the right of the corporation to rely upon record ownership, not beneficial ownership, in determining who is entitled to notice of and to vote at the meetings of stockholders."); *Preston v. Allison,* 650 A.2d 646, 649 (Del. 1994) ("[T]he corporation generally is entitled to rely on its own stock list and recognize votes ... only when initiated by the stockholder of record."); *Testa v. Jarvis,* 1994 WL 30517, at *6 (Del.Ch. Jan. 12, 1994) (footnote and internal citations omitted) ("Delaware corporations may rely almost exclusively on the stock ledger to determine the record holders eligible to vote in an election.... Where the company's ledgers show record ownership, no other evidence of shareholder status is necessary.").

228(e) to reinforce that interpretation.[37]

Section 228(e) requires that prompt notice of corporate action taken by less than unanimous written consent be provided to non-consenting stockholders "who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders . . . were delivered to the corporation. . . ." [38] By defining the notice obligation for written consents in terms of what would be required for a hypothetical meeting, section 228(e) strengthens the connection between voting by consent and voting at a meeting. The Court of Chancery also relied on section 212(b), which provides that "[e]ach stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy. . . ." [39]

In this case, the Court of Chancery explained why it decided to adhere to the holdings in *Freeman* and *Grynberg* that a written consent must be executed by a stockholder of record.

By treating stockholders identically for purposes of granting proxy authority, regardless of whether the vote is at a meeting or by written consent, section 212(b) indicates that the same principles should apply in both instances. Just as only a stockholder of record can vote at a meeting, only a stockholder of record can execute a written consent.

As a matter of Delaware public policy, there is much to be said for requiring a written consent to be executed by a record holder, which allows the corporation or an inspector of elections to determine from readily available records whether the consent was valid. Certainty and efficiency are critical values when determining how stockholder voting rights have been exercised. *Williams v. Sterling Oil of Okla., Inc.,* 273 A.2d 264, 265–66 (Del.1971); *N. Fork Bancorp., Inc. v. Toal,* 825 A.2d 860, 868 n. 19 (Del.Ch.2000); *Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 668 (Del.Ch. 1988). This is particularly true for consents, which are effective upon delivery to the corporation of a sufficient number of valid consents.[40]

The Court of Chancery's holding that a written consent must be executed by a stockholder of record did not end its analysis of how to define who is a record holder on the stock ledger.

### Court of Chancery Redefines Stock Ledger

The statutory mandate in section 219(c) provides that only stockholders of record who appear on the stock ledger can vote. Therefore, the Court of Chancery continued its analysis by considering whether the Cede breakdown should be part of the stock ledger for purposes of Section 219(c). It concluded:

There is a straightforward basis for doing so, namely our law's long recognition that the Cede breakdown is part of the stock ledger for purposes of Section 220(b). If the Cede breakdown is part of the stock ledger, then the banks and brokers who appear on the Cede breakdown have the power to vote as record

---

37. *See Freeman v. Fabiniak,* 1985 WL 11583, at *5; *Grynberg v. Burke,* 1981 WL 17034, at *6.

38. Del.Code Ann. tit. 8, § 228(e) (West Supp. 2010).

39. Del.Code Ann. tit. 8, § 212(b) (2001).

40. Del.Code Ann. tit. 8, § 228(a) (2001).

holders at a meeting of stockholders or for purposes of taking action by written consent.

The history of the depository system is set forth on DTC's website.[41] The holding of securities through DTC has significance under Delaware law because it is Cede, not the DTC-participant banks and brokers, that appears on the stock ledger of a Delaware corporation. The Court of Chancery noted that Cede is typically the largest record holder on the stock ledger of most publicly traded Delaware corporations. Under Delaware law, only stockholders who appear on the stock ledger have authority to vote at a meeting or express consent.

The DTC omnibus proxy currently serves as the mechanism by which the federally mandated depository system of indirect ownership through DTC comports with Delaware's system of direct ownership evidenced through the stock ledger. The DTC omnibus proxy operates to ensure the transfer of DTC's voting authority to the participant members. As one treatise explains: "Because DTC has no beneficial interest in its shares . . ., it has

devised a mechanism to pass on its voting rights. This mechanism, called the 'omnibus proxy,' provides for the transfer of DTC's voting right to its clients—the bank and broker participants." [42]

The record reflects that DTC issues the omnibus proxy as a matter of course during the interactions between issuers and DTC that are compelled by the federal securities laws. When preparing for a meeting of stockholders or a consent solicitation, issuers are required by federal law to go through DTC to identify the participant banks and brokers for purposes of distributing voting cards and solicitation materials.[43] An issuer typically starts the process by requesting a Cede breakdown so that it can send out the broker search cards.[44] When the entire process is complete, the issuer provides each bank and broker with sufficient copies of the proxy statement, card, and other materials for distribution to the beneficial owners.[45]

Thirty years ago, when the depository system was still new, the Court of Chancery held that a stockholder was entitled to a Cede breakdown under Section 220

---

**41.** DTCC.com, About DTC–History, http://www.dtcc.com/about/history/ (last visited Apr. 19, 2010); *see also* Emily I. Osiecki, Note, *Alabama By–Products Corp. v. Cede & Co.: Shareholder Protection Through Strict Statutory Construction*, 22 Del. J. Corp. L. 221, 223–29 (1997); Suellen M. Wolfe, *Escheat and the Challenge of Apportionment: A Bright Line Test To Slice A Shadow*, 27 Ariz. St. L.J. 173, 178–88 (1995).

**42.** John C. Wilcox, John J. Purcell III, & Hye–Won Choi, *"Street Name" Registration & The Proxy Solicitation Process* at 10–9 in Amy Goodman, et al., *A Practical Guide to SEC Proxy and Compensation Rules* 10–3 (4th ed. 2007 & 2008 Supp.).

**43.** At least twenty business days prior to the record date, an issuer must send a broker search card to any "broker, dealer, voting

trustee, bank, association, or other entity that exercises fiduciary powers in nominee name" that the company "knows" is holding shares for beneficial owners. 17 C.F.R. § 240.14a–13(a) (2010). Rule 14a–13 provides that "[i]f the registrant's list of security holders indicates that some of its securities are registered in the name of a clearing agency registered pursuant to Section 17A of the Act (*e.g.*, 'Cede & Co.,' nominee for Depository Trust Company), the registrant shall make appropriate inquiry of the clearing agency and thereafter of the participants in such clearing agency." 17 C.F.R. § 240.14a–13(a) n. 1 (2010).

**44.** Teresa Carnell & James J. Hanks, Jr., *Shareholder Voting and Proxy Solicitation: The Fundamentals*, Maryland Bar Journal, 27 (Jan./Feb. 2004).

**45.** 17 C.F.R. § 240.14b–1 (2010).

when the stockholder sought a stocklist.[46] Subsequent Delaware decisions have consistently ordered the production of a Cede breakdown as part of the section 220 stocklist materials.[47] In this case, the Court of Chancery reasoned that "if a Cede breakdown is part of the stock ledger for purposes of Section 220(b), it logically should be part of the stock ledger for purposes of Section 219(c) and should be used to create the stocklist under Section 219(a)."

The Court of Chancery acknowledged that this conclusion was contrary to "the established understanding among practitioners, evidenced by our case law, ... that DTC (through Cede) is the record holder and that everyone above DTC is a beneficial holder." The Court of Chancery reached that conclusion by characterizing the relationship between DTC and its participant banks and brokers as fundamentally different from the relationships further up the chain. Consequently, the court did "not believe that there are any practical or policy-based impediments to treating the Cede breakdown as part of the stock ledger." Nevertheless, it concluded:

> My ruling does not alter the traditional distinction between record and beneficial ownership. The analysis I have followed does not apply to any entity other than DTC in its role as a federally registered clearing agency. The view from the top of the beneficial ownership chain remains as always: beneficial holders are not record holders.

Having completed its analysis, the Court of Chancery declined to follow well-established prior precedents construing the meaning of the term "record holder" and announced a new interpretation of "stock ledger" under section 219 of the DGCL:

> The Cede breakdown showing the banks and brokers who held EMAK stock at DTC as of October 22, 2009, was part of EMAK's stock ledger for purposes of Section 219(c). Those banks and brokers were therefore stockholders of record entitled to express consent to corporate action without a meeting under Section 228(a). Accordingly, the Broadridge omnibus consents validly voted the shares held by those banks and brokers, without the need for a DTC omnibus proxy.

The Court of Chancery acknowledged that under section 219(c) it is the "stock ledger" that determines who are the record holders. It concluded, however, that the Cede breakdown should be considered "part of the stock ledger for purposes of Section 219(c), just as the Cede breakdown has long been part of the stock ledger for purposes of Section 220(b)." The Court of Chancery recognized that its new interpretation "represents a change in how Delaware practitioners understand the stock ledger for purposes of voting...." In fact, based upon prior Delaware precedents, the Court of Chancery acknowledged that its own initial view was that the absence of a DTC omnibus proxy would be dispositive.

46. *Hatleigh Corp. v. Lane Bryant, Inc.*, 428 A.2d 350, 354 (Del.Ch.1981); *Giovanini v. Horizon Corp.*, 1979 WL 178568, at *2 (Del. Ch. Sept. 10, 1979).

47. E.g., *Berger v. Pubco Corp.*, 2008 WL 4173860, at *3 (Del.Ch. Sept. 8, 2008); *Wynnefield Partners Small Cap Value, L.P. v. Niagara Corp.*, 2006 WL 2521434, at *2 (Del. Ch. Aug. 9, 2006); *Envt'l Diagnostics, Inc. v. Disease Detection Int'l, Inc.*, 1988 WL 909658, at *3 (Del.Ch. July 15, 1988); *RB Assocs. of N.J., L.P. v. Gillette Co.*, 1988 WL 27731, at *2–5 (Del.Ch. Mar. 22, 1988); *Shamrock Assocs. v. Texas Am. Energy Corp.*, 517 A.2d 658, 661 (Del.Ch.1986); *Weiss v. Anderson, Clayton & Co.*, 1986 WL 5970, at *4 (Del.Ch. May 22, 1986).

The Court of Chancery noted that the DTC system usually works well. The record reflects that the DTC omnibus proxy is routinely obtained and simply becomes another item on a preparation checklist. In this case, the absence of a DTC omnibus proxy did not result from a breakdown in the DTC system. The failure in this case was attributable to human oversight on someone's party by not making a proper and timely request. The Court of Chancery concluded that insisting on the DTC omnibus proxy would disenfranchise the beneficial owners. To avoid that result it decided that Delaware law would benefit "from treating the Cede breakdown as part of the stock ledger for purposes of Section 291(c)."

The parties have extensively briefed and argued both sides of the issue of whether the Cede breakdown is (or is not) part of the "stock ledger" for section 219 purposes. Given our ruling invalidating the votes attributable to the Boutros shares, it is unnecessary for this Court to decide that issue, because a decision either way would not alter the result we have reached nor would a gratuitous statutory interpretation resolving this difficult issue be prudent. The human failures that occurred in this case are easily avoidable in the future and may be a one-time anomaly that may not again occur.

Moreover, and in any event, a legislative cure is preferable. The DGCL is a comprehensive and carefully crafted statutory scheme that is periodically reviewed by the General Assembly. Indeed, the General Assembly made coordinated amendments

to section 219 and section 220 in 2003. Any adjustment to the intricate scheme of which section 219 is but a part should be accomplished by the General Assembly through a coordinated amendment process. Therefore, the Court of Chancery's interpretation of stock ledger in section 219 is *obiter dictum* and without precedential effect.

### Crown Bylaw Amendments Are Invalid

■ The Court of Chancery held that the Crown Consents are ineffective because they purported to amend the Bylaws in a manner that conflicts with the DGCL. Section 109(b) of the DGCL provides that the bylaws of a Delaware corporation "may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees."[48] Therefore, a bylaw provision that conflicts with the DGCL is void.

Through the Bylaw Amendment to section 3.1, Crown tried to reduce the Board's size below the number of currently sitting directors. Generally, in a contested election, an insurgent first removes the challenged directors, then reduces the number of directorships, and then fills the vacancies.[49] We hold that was the legally proper sequence for accomplishing Crown's objective in this case.

Crown could not follow that approach, however, because Crown was not entitled to vote the Series AA Preferred to remove

---

**48.** Del.Code Ann. tit. 8, § 109(b) (2001).

**49.** *See, e.g., Waggoner v. Laster*, 581 A.2d 1127, 1129–30 (Del.1990) (describing effort by written consent to remove board, reduce size of board, and elect new directors); *AGR Halifax Fund, Inc. v. Fiscina*, 743 A.2d 1188, 1191 (Del.Ch.1999), *aff'd*, 2000 WL 313439

(Del. Mar. 15, 2000) (describing effort by written consent to remove directors, reduce size of board, and elect new directors); *Kalageorgi v. Victor Kamkin, Inc.*, 750 A.2d 531, 536 (Del.Ch.1999) (describing effort by written consent to remove directors and then reduce size of board).

directors. Under section 141(k) of the DGCL, shares can vote to remove directors only if they can vote to elect directors.[50] The Series AA Preferred does not vote to elect directors; consequently, it cannot vote to remove directors.

Section 141(b) of the DGCL provides that "[t]he number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the certificate of incorporation fixes the number of directors, in which case a change in the number of directors shall be made only by amendment of the certificate."[51] The EMAK charter does not fix the number of directors, which instead is addressed in Section 3.1 of the Bylaws. Therefore, the defendants correctly assert that stockholders exercising a majority of EMAK's outstanding voting power, including the Series AA Preferred, can alter the size of the Board through a bylaw amendment.

The DGCL addresses what happens with the newly-crated directorships where the size of the board is increased. Under section 223(a)(1), unless otherwise specified in the certificate of incorporation or bylaws, "newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum."[52] Although EMAK's charter is silent on this point, Section 3.2 of its Bylaws provides that the Board may fill newly created directorships. Under Delaware case law, newly created directorships also may be filled by the stockholders.[53]

The Court of Chancery recognized that this case—involving a reduction in the size of the board—presented an issue of first impression:

> Our law has not addressed what happens when a bylaw amendment would shrink the number of board seats below the number of sitting directors. The DGCL does not address it. No Delaware court has considered it. None of the leading treatises on Delaware law mention it.[54] Indeed, no one seems to have contemplated it.

New Section 3.1 would reduce the Board to three directorships at a time when five directors are legally in office. The Court of Chancery identified two possible scenarios for the resulting "surplus directors." One is that their terms would end. The other is that they would continue to serve without *de jure* official status, until their terms were ended by a statutorily recognized method. The Court of Chancery held that both possible scenarios conflict with the DGCL. We agree.

First, the Court of Chancery concluded that the scenario in which the terms of the extra directors would end conflicts with section 141(b)'s *mandate* that "[e]ach director *shall* hold office until such director's successor is elected and qualified or until such director's earlier resignation or re-

---

**50.** *See* Del.Code Ann. tit. 8, § 141(k) ("Any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then *entitled to vote at an election of directors ....*") (2001) (emphasis added).

**51.** Del.Code Ann. tit. 8, § 141(b) (Supp.2008).

**52.** Del.Code Ann. tit. 8, § 223(a)(1) (2001).

**53.** *Moon v. Moon Motor Car Co.*, 151 A. 298, 302 (Del.Ch.1930).

**54.** *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 4.2 (3d ed. & 2003 Supp.); 1 David A. Drexler et al., *Delaware Corporate Law and Practice* §§ 13.01[2][3] (2009); 1 Edward P. Welch, *et al., Folk on the Delaware General Corporation Law* §§ 141.3, 141.5 (5th ed. 2006 & 2008 Supp.).

moval."[55] Section 141(b) recognizes three procedural methods by which the term of a sitting director can be brought to a close: first, where the director's successor is elected and qualified; second, if the director resigns, or third; if the director is removed. Section 141(b) does not contemplate that a director's term can end through board shrinkage. Accordingly, the Court of Chancery properly held that a bylaw that seeks to achieve this result conflicts with section 141(b) and is void.

The Court of Chancery also held that the presence of directors without board seats would create a conflict between the number of directors in office and the number of directors provided for in the bylaws. Section 141(b) states that "[t]he number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the certificate of incorporation fixes the number of directors."[56] Section 141(b) does not contemplate a board with more directors serving than the "number . . . fixed by . . . the bylaws."

New Section 3.1 fixed the number of EMAK directors at three. If the excess directors are not eliminated, then for some period of time, EMAK will have a greater number of directors serving than the number for which the Bylaws provide. Such an occurrence is contrary to section 141(b) and, therefore, the Court of Chancery properly concluded, is not legally possible.

The Court of Chancery held that the existence of more incumbent directors than there are board seats also conflicts with the statutory quorum requirement for board action. Section 141(b) provides:

A majority of the total number of directors shall constitute a quorum for the transaction of business unless the certificate of incorporation or the bylaws require a greater number. Unless the certificate of incorporation provides otherwise, the bylaws may provide that a number less than a majority shall constitute a quorum which in no case shall be less than 1/3 of the total number of directors except that when a board of 1 director is authorized under this section, then 1 director shall constitute a quorum.[57]

"[T]he universal construction" of the above-quoted language has been that it "refers to directorships, not directors actually in office."[58] The Court of Chancery explained why quorum requirements would be impossible to apply if the number of directors could exceed the number of directorships:

Start with the statutory minimum quorum of "1/3 of the total number of directors" and envision a bylaw amendment that converted a board of twelve directors into a board of three directorships, with nine continuing but seatless directors. A single director could satisfy the statutory one-third quorum requirement, despite twelve directors serving on the board. EMAK has a majority quorum requirement. If the Bylaw Amendments turned two of the directors into continuing but seatless directors, then a quorum would be two out of three seats. Yet there would be five directors in office. The concept of continuing but seatless directors thus con-

55. Del.Code Ann. tit. 8, § 141(b) (Supp.2008).

56. Del.Code Ann. tit. 8, § 141(b) (Supp.2008).

57. *Id.*

58. 1 David A. Drexler et al., *Delaware Corporate Law and Practice* § 13.01[2], at 13–5 n. 24 (2009); *see, e.g., Belle Isle Corp. v. MacBean*, 49 A.2d 5, 8 (Del.Ch.1946) (basing quorum on directorships), *Mecleary v. John S. Mecleary, Inc.*, 119 A. 557, 559 (Del.Ch.1923) (same), *Bruch v. Nat'l Guar. Credit Corp.*, 116 A. 738, 740 (Del.Ch.1922).

flicts with section 141(b)'s mechanism for determining a quorum. Once again, the Bylaw Amendments are void.

The Court of Chancery held that new Bylaw Section 3.1.1 conflicts with the statutory framework of the DGCL by conflating what takes place at an annual meeting with what can take place in between annual meetings. The DGCL establishes an annual electoral cycle for directors who are not elected by the holders of a particular class or series of stock.[59] Except in the case of a properly classified board, the occupants of all directorships contemplated by the corporation's charter and bylaws are up for annual election.[60] Pursuant to this statutory framework, "absent a specific charter or bylaw provision classifying a board, the term of office of each director is coextensive with the period between annual meetings." [61]

■ Section 211(b) distinguishes between stockholder action at an annual meeting and stockholder action between annual meetings. Section 211(b) provides that stockholders can take action by written consent to elect directors in lieu of an annual meeting if (i) the action by consent is unanimous *or* (ii) "all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action." [62] In this case, the action by consent was not unanimous and there were no vacant directorships. To operate in lieu of an annual meeting, a non-unanimous written consent thus must first remove all sitting directors and then fill the resulting vacancies. Stockholders cannot use a non-unanimous written consent to remove lawfully serving incumbent directors, and then elect successor directors, between annual meetings.

New Section 3.1.1 provides that if the number of directors in office is greater than three, then a special meeting of stockholders will be called at which "one director" will be elected by the common stockholders "who shall be the successor to all directors previously elected by the common stockholders of the Corporation." The Court of Chancery opined that:

> If the number of seats on the board was reduced in conjunction with the election of directors at an annual meeting such that only one seat was up for election, then this mechanism would be valid. In that scenario, stockholders would elect directors to all available seats, albeit only one, and the terms of the previously serving directors would expire in conjunction with the election and qualification of their singular successor.

■ New Section 3.1.1, however, does not propose to alter the Board's size in conjunction with an annual meeting. It contemplates the calling of a special meeting at which stockholders would act to elect a "successor" director. The election of successors takes place at an annual meeting, not between annual meetings. Stockholders can act in between annual meetings to remove directors, to fill vacancies, or to fill newly created directorships.[63] They cannot end an incumbent

---

**59.** Del.Code Ann. tit. 8, § 211(b) (2001).

**60.** Del.Code Ann. tit. 8, § § 141(d) & 211(c) (Supp.2008 & West Supp.2010); *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *11 (Del.Ch. July 21, 2000).

**61.** 1 David A. Drexler et al., *Delaware Corporate Law and Practice* § 13.01[3], at 13–6 (2009).

**62.** Del.Code Ann. tit. 8, § 211(b) (2001).

**63.** 1 David A. Drexler et al., *Delaware Corporate Law and Practice* § 13.02 at 13–27 to 13–28 (2009).

director's term prematurely by purporting to elect the director's successor before the incumbent's term expires.

As the Court of Chancery explained "[p]ermitting such action would contradict the limited and enumerated means in which a director's term can end under Section 141(b), the specific mechanism for director removal set forth in Section 141(k), and the concept of an annual meeting at which directors are elected under Section 211(b)." Accordingly, the Court of Chancery properly held that new section 3.1.1 is also invalid.

### Conclusion

The judgments of the Court of Chancery are affirmed in part and reversed in part. This matter is remanded for further proceedings in accordance with this opinion. The mandate shall issue immediately.