**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MICKAEL A. FLAA,                                )
                                                )
                   Plaintiff,                   )
                                                )
        v.                                      ) *Civil Action No. 9146-VCG*
                                                )
DANIEL C. MONTANO, VIKTORIYA                    )
T. MONTANO, JOHN W. JACOBS,                     )
ERNEST C. MONTANO, ERNEST                       )
MONTANO III and JOONG KI BAIK,                  )
                                                )
                   Defendants,                  )
                                                )
        and                                     )
                                                )
CARDIOVASCULAR                                  )
BIOTHERAPEUTICS, INC.                           )
                                                )
                   Nominal Defendant.           )

## MEMORANDUM OPINION

Date Submitted:  May 2, 2014
Date Decided:  May 29, 2014

Richard P. Rollo, of Richards, Layton & Finger, P.A., Wilmington, Delaware; OF COUNSEL:  Barry F. Cannaday, of Dentons US LLP, Dallas, Texas, Attorneys for the Plaintiff.

David L. Finger, of Finger & Slanina, LLC, Wilmington, Delaware, Attorney for the Defendants.

GLASSCOCK, Vice Chancellor

This Memorandum Opinion concerns the latest skirmish in the battle for control of CardioVascular BioTherapeutics, Inc. ("Cardio," or the "Company"), between forces allied with its founder, Daniel Montano, and those supporting a large creditor of Cardio, Calvin Wallen. Although Cardio has not yet been able to monetize any product, both parties view the Company as on the cusp of success. The current dispute is over the second written consent action taken on behalf of the Wallen faction in less than a year, seeking to seat a board of directors amenable to him, and purporting to remove Montano and his supporters from the Cardio board. The stockholders' view, as revealed by the written consent actions, is in near equipoise. The deciding votes in both consent actions were cast by Vizier Investment Capital Limited ("Vizier"), an entity created by Montano to hold Cardio stock he held jointly with his then-wife, Victoria "Vicki" Montano. Vicki,[1] now divorced from Montano, purported to consent with respect to the Vizier shares in favor of the Wallen slate in the first consent action; I found those consents to be invalid, as Vicki lacked the authority to vote the shares. Montano has since entered personal bankruptcy, and the Vizier shares are now under the control of a trustee in bankruptcy. The trustee provided a proxy to Wallen which he used to vote the Vizier shares in favor of his slate of directors in the second consent action; for the reasons below, I find that the agreement between Wallen and the trustee

---

[1] I refer to Vicki Montano by her first name to avoid confusion. No disrespect is intended.

was inadequately disclosed to stockholders of Cardio, and that the second consent action is invalid.

Shortly after the first consent action, the Wallen faction was seated as the "new" Cardio board, and one of the board members, Plaintiff Mickael A. Flaa, brought the first incarnation of this action under Section 225 to confirm the validity of that board. I entered a status quo order leaving the Wallen faction in place as the interim board of directors, with its ability to act limited to actions in the normal course of business, pending resolution of the dispute in this Court. After I found that the first consent action was invalid, the Plaintiff appealed, and the parties agreed that the status quo order should remain in effect. That appeal was delayed, however, as Wallen mounted the second consent action. Because this second action had the potential to moot all issues on appeal, the Supreme Court stayed consideration of the appeal, and the current litigation ensued.

Cardio has been, effectively, in limbo for nearly a year, with a board of directors unable to exercise plenary authority over the corporation. Moreover, the record indicates that it has been years since an annual meeting of the stockholders has taken place. A stockholder meeting presided over by the interim board would inevitably drive more litigation, and seating the old Montano-faction board would put back in place directors last elected years ago, who have not served in nearly a year. In order to ensure a board of directors representing the preference of the

stockholders as expressed by exercise of their franchise, I employ my discretion to order a stockholder meeting to be held promptly, presided over by a special master.

## I. FACTS

### 1. *Flaa I*

As explained in a prior iteration of this action, *Flaa I*,[2] Cardio is a Delaware corporation that, due to its as-yet unsuccessful efforts to develop a drug candidate for treating coronary artery disease, peripheral artery disease, venous ulcers, and diabetic foot ulcers, has faced a serious liquidity crisis.[3] This litigation involves the second Court of Chancery action within a matter of months brought pursuant to 8 *Del. C.* § 225, seeking to confirm the removal of certain directors of Cardio, including its founder Daniel Montano, by way of a written consent action led by one of Cardio's largest creditors, Calvin Wallen.

As presented in more detail in *Flaa I*, in January 2013, Wallen, hoping to salvage some of his investment in Cardio, sent a letter to the Company's board of directors, in which he set forth a financing proposal intended to infuse $8,500,000 of capital into the Company, contingent on the immediate resignation of the director Defendants, including Montano, and on Montano waiving all claims

---

[2] *Flaa v. Montano*, 2013 WL 5498045 (Del. Ch. Oct. 4, 2013).
[3] *See* Defs.' Op. Pre-Trial Br. at 2 ("Finding investors who wanted to invest in a company with no saleable products was difficult.").

4

against Cardio.[4] When the Cardio board rejected his financing proposal, Wallen initiated a written consent action (the "First Consent Action"), requesting that stockholders consent to (1) amending the Company's bylaws with respect to director removal and appointments, (2) removing the Defendant directors from the Cardio board, and (3) directing the remaining directors to consider his financing proposal. As a result of Wallen's written consent solicitation, the Company received consents from 51.22% of shares outstanding, and the Plaintiff filed suit in this Court in June 2013, seeking to confirm the effectiveness of the First Consent Action. However, I determined in *Flaa I* that a dispositive consent delivered on behalf of Vizier, a Bahamian company jointly owned by Montano and his ex-wife, Vicki, was executed without actual or apparent authority; accordingly, I found that the First Consent Action was ineffective to remove the Defendant directors from the Cardio board.

At the start of litigation in *Flaa I*, a status quo order was put in place (the "Status Quo Order"), permitting incumbent directors Grant Gordon and Mickael Flaa, as well as the incoming directors seated pursuant to the First Consent Action—Wallen, Jon Ross, and Robert Schleizer—(collectively, the "Interim

---

[4] That letter was preceded by both a June 2012 request by Wallen that Cardio convert his debt to equity, which request was rejected by the Cardio board, and a September 2012 Nevada action in which Wallen sought to enforce Montano's personal guarantee of loans from Wallen to Cardio. Those transactions are described in additional detail in *Flaa I*. *See Flaa*, 2013 WL 5498045, at *2.

Board") to sit on the Cardio board of directors pending resolution of the litigation.[5]

After I issued my October 4, 2013 Memorandum Opinion, the Plaintiff filed an appeal of that decision in our Supreme Court. Pending that appeal, the parties stipulated to abide by the Status Quo Order. As explained in more detail below, the appeal of my October 4 Memorandum Opinion has been stayed pending resolution of this 225 action,[6] and the Interim Board continues to manage the Company pursuant to the Status Quo Order.

## 2. The Second Consent Action

On November 6, 2013, as the parties were briefing the Defendants' appeal in *Flaa I*, Wallen caused Cardio stockholder CCM Partners Fund LP ("CCM") to deliver a written consent to Cardio's registered agent, initiating a new written consent action (the "Second Consent Action"). In a November 16, 2013 press release, the Company said of the Second Consent Action, "[t]o avoid any potential confusion, the solicitation is being made by Calvin Wallen III, a [Cardio] stockholder, and not by [Cardio]."[7] Upon delivery of CCM's written consent, Wallen circulated proxy solicitation materials, consisting of a proxy statement and proxy card dated November 11, 2013, to Cardio's stockholders.

The proxy card included in Wallen's solicitation materials stated, in part:

---

[5] *Flaa v. Montano*, No. 8632–VCG (Del. Ch. July 12, 2013) (ORDER).
[6] *Flaa v. Montano*, No. 577,2013 (Del. Jan. 30, 2014) (Letter to Counsel).
[7] JX 82.

The undersigned hereby acknowledges receipt of the proxy statement in connection with the proposals to amend the Amended and Restated Bylaws of [Cardio] and to remove all members of the Board of Directors of the Corporation other than Mickael Flaa and Grant Gordon . . . .

The undersigned hereby constitutes and appoints Calvin A. Wallen, III, as his, her or its true and lawful agent and proxy with full power of substitution and re-substitution, to execute a written consent, withhold consent, or abstain on behalf of all of the shares held by the undersigned as of the Record Date, in accordance with the instructions given herein.[8]

The proxy statement included in the solicitation materials described Wallen's "proposals" in more detail: Proposition 1 purported to amend the Cardio bylaws with respect to removal and appointments, and Proposition 2 to remove certain directors. Specifically, Proposition 2 stated:

BE IT RESOLVED, that the undersigned hereby consents to, adopts and approves the removal of all of the members of the Board of Directors of the Corporation in office immediately prior to the effective time of [the] Written Consent other than Mickael A. Flaa and Grant Gordon (each director so removed, a "Removed Director," and all directors so removed, collectively, the "Removed Directors"), and without limiting the intent of the stockholders to remove all such Removed Directors, the Removed Directors shall specifically include each of Daniel C. Montano, Viktoriya Tamlenova Montano, Ernest C. Montano, Ernest Montano III, John (Jack) W. Jacobs and Joong Ki Baik, if he or she is in office immediately prior to the effective time of this Written Consent.[9]

Though stockholders received identical proxy solicitation materials, Wallen obtained proxies in the Second Consent Action by three methods: (1) Vizier and

---

[8] Pl.'s Pre-Trial Answering Br. at 5.
[9] Compl. Ex. E at 1799982.2.

certain other stockholders not at issue here executed proxies by hand-delivery of completed paper proxy cards; (2) certain Cardio stockholders of record executed electronic proxies by telephone and internet, purporting to permit Wallen to deliver written consents on their behalves; and (3) certain brokerage firms executed powers of attorney to a proxy tabulating agency, Broadridge, which in turn executed proxies purporting to permit Wallen to deliver written consents on behalf of the stocks' record owners. On November 27, 2013 and January 2, 2014, Wallen delivered written consents to Cardio's registered agent supported by proxies obtained from these other Cardio stockholders, by which a majority of the Cardio shares purported to consent to the removal of the "Removed Directors"—the Defendants in this action.

*A. The Vizier Proxy*

In *Flaa I*, I determined that a written consent, executed by Montano's ex-wife Vicki on behalf of Vizier, was executed without actual or apparent authority. At that time, Vizier held 30 million shares of Cardio, jointly owned by Daniel and Vicki Montano. I found that Montano, as President of Vizier, had authority to vote the Cardio shares, and that Vicki, in her capacity as either Vice President or stockholder, did not.

In July 2013, Montano filed for bankruptcy under Chapter 7 of the U.S. Bankruptcy Code. As a result of that filing, U.S. Bankruptcy Trustee Dotan

8

Melech (the "Trustee") obtained control over Montano's interest in 4 million directly-held shares of Cardio, as well as his fifty-percent interest in the 30 million Cardio shares held by Vizier. Soon after this Court issued its Memorandum Opinion on October 4, 2013 in *Flaa I*, the Trustee began to discuss with Wallen and the other members of the Cardio Interim Board the Company's financial status. Specifically, in late October, the Trustee "requested a copy of the [Cardio] business plan and copies of the financial proposals [from Wallen] that will fund the business plan,"[10] which Flaa provided in detail by email dated November 1, 2013.

Around the same time in early November, Wallen communicated with the Trustee via email and conference call in an attempt to secure Vizier's proxy in the Second Consent Action.[11] As a preliminary matter, for the Trustee to obtain the authority to execute the requested proxy on Vizier's behalf, the Trustee and Montano's ex-wife Vicki, acting as stockholders of Vizier,

> (a) . . . executed a Unanimous Written Consent (i) removing the current directors of Vizier and appointing the Trustee and [Vicki] Montano as the sole Directors of Vizier, and (ii) removing [Montano] as President of Vizier and appointing the Trustee as President and [Vicki] Montano as the Vice President of Vizier, and (b) [Vicki] Montano and the Trustee, as the sole Directors of Vizier, executed a

---

[10] JX 72 at 2014CVBT00005103.

[11] Although the final written agreement into which Wallen and the Trustee ultimately entered, as described in more detail below, did not include a requirement that the Trustee vote in favor of the Second Consent Action, such was clearly the parties' intent. *See, e.g.*, JX 113 at 2014CVBT00003066 ("I fear that the vote will not get done unless we can get [the Trustee] additional insurance re the below."); *id.* at 2014CVBT00003067 ("Here is [Wallen's] signature on the share purchase agreement. Please let me know whether you now have everything you need in order for the Trustee to be able to vote today.").

> Unanimous Written Consent of Board of Directors (i) appointing the Trustee as President and [Vicki] Montano as the Vice President of Vizier, (ii) affirming that, in accordance with the Memorandum of Association and Articles of Association of Vizier, it is the sole responsibility of the Trustee, as the President of Vizier, to manage the day to day affairs of Vizier, including, but not limited to voting the Vizier shares of [Cardio].[12]

In seeking to secure the Trustee's commitment to execute a proxy on Vizier's behalf, Wallen and the Trustee also began negotiating a deal whereby Wallen would purchase 1 million shares of Cardio from the Montano bankruptcy Estate, in exchange for a sum of money (described by the Trustee as five times its actual value) *and* a director seat on the Cardio board of directors; such an agreement would provide the Montano Estate some much-needed liquidity in addition to an ability to protect its only asset, Cardio stock. According to a series of emails between counsel for the Trustee and Wallen, the Trustee's bankruptcy counsel "propos[ed] (subject to Bankruptcy Court approval) that the Trustee would vote the Vizier shares 'as requested,' the Trustee would designate a member of the [Cardio] board to replace a member of the Interim Board, Mr. Wallen or another party would purchase 1 million shares of [Cardio] stock from Vizier for $1.00 per share, and the estate would receive certain undefined minority stockholder rights."[13] Wallen countered that "the Trustee's vote would be irrevocable, [the Trustee's board designee] Mr. Moran would be appointed as an additional, and not

---

[12] JX 78 at AR11.
[13] Defs.' Op. Pre-Trial Br. at 11-12.

10

a replacement, director, and Mr. Wallen would pay 5 cents a share for the 1 million shares of [Cardio]."[14] The parties eventually settled on an exchange under which Wallen would purchase from the Montano Estate 1 million shares of Cardio at $0.25 per share, in addition to granting the Trustee certain other rights described in more detail below. Further, Wallen's counsel explained to the Trustee that:

> Under Delaware law, the Cardio Board of Directors has a fiduciary duty to the shareholders to consider the qualifications of any proposed addition to the Board and to make an independent determination that it will be in the best interest of the shareholders of Cardio to appoint the person who is put up for a vacant position on the Board (which is what will happen here). They cannot agree in advance to simply appoint anyone the Trustee designates.[15]

While the Trustee initially responded that the Cardio Interim Board's inability to commit to appointing the Trustee's board designee was a "deal breaker,"[16] the parties eventually agreed to the following language in a November 22, 2013 Agreement for the Purchase and Sale of Stock (the "Stock Purchase Agreement"):

> If Wallen is able to confirm the Wallen Group's right to manage [Cardio] . . . then Wallen will use his best efforts, consistent with his fiduciary duties, to cause the Board of Directors to add an additional two members, with one to be selected by the Wallen [sic] and the other by the Trustee. If Wallen and his aligns are confirmed as management of [Cardio] and these two positions are not added through no fault of the Trustee, Wallen shall return the Shares to the

---

[14] *Id.* at 12.
[15] JX 86 at 6.
[16] *Id.* at 5.

11

Trustee for no consideration, but the Trustee shall be entitled to retain the Purchase Price and apply it to the Montano Estate asset base.[17]

In addition, the parties agreed that if the Second Consent Action was unsuccessful or ineffective, "then the Trustee [would] promptly repurchase from Wallen 500,000 shares of [Cardio] stock for $0.25 per share with such $125,000 payment to [be] made from the Purchase Price funds. The Trustee [would] then apply the remaining $125,000 of the Purchase Price to the Montano Estate asset base."[18]

In other words, Wallen and the Trustee agreed that, in exchange for the Trustee's proxy, Wallen would purchase 1 million Cardio shares from the Montano Estate for $250,000. If the Second Consent Action was successful, Wallen would use his best efforts to secure an additional seat on the Cardio board for the Trustee's designee; if, despite his best efforts, he failed to secure that seat, Wallen would return all 1 million shares but the Trustee would retain the entire $250,000. If the Second Consent Action was unsuccessful, Wallen would return 500,000 shares and the Trustee would return $125,000.

Prior to executing the November 22 Stock Purchase Agreement, on November 8, 2013, the Trustee filed a Motion for Order Authorizing Trustee to Take Certain Actions and Sell Certain Assets Free and Clear of Liens, Claims and

---

[17] JX 87 at ¶ 5. Wallen's counsel noted that "Wallen would not be doing this deal if he had any uncertainty about being able to fulfill his obligations to have new directors appointed. If he doesn't meet his commitment, he forfeits $250,000 and the Trustee gets all the stock back. That is a pretty drastic penalty for not performing, but [Wallen] is willing to agree to this because he is very comfortable that he can fulfill this obligation." JX 113 at 3087.

[18] JX 87 at ¶ 3.

Encumbrances without Further Court Approval (the "Motion") in the District of Nevada U.S. Bankruptcy Court.[19] In that Motion, the Trustee submitted to the court that:

> [Cardio] is . . . currently at a crossroads, where either (a) [Cardio] will resolve its litigation and obtain sufficient funding to launch a new product that may result in significant returns to its shareholders, or (b) [Cardio] will not resolve its litigation, will not obtain funding, and may ultimately wind up in its own bankruptcy proceeding, leaving this Estate's creditors with little to no return on account of their claims.[20]

The Trustee sought in his Motion "authority, out of an abundance of caution, to take actions necessary to allow the estate to vote the [Cardio] shares that it owns [in Vizier]," as well as permission to sell 1 million Cardio shares held by the bankruptcy estate to Wallen for $0.25 per share, in order "to provide for an immediate return to the Estate, limiting the Estate's downside should [Cardio] ultimately be unsuccessful in its business endeavors."[21] The Trustee also represented in his Motion that, based on "multiple meetings with Calvin Wallen, [Montano], related parties, and their representatives to determine how to proceed with regard to [Cardio]," "the Trustee ha[d] determined that it may be prudent to

---

[19] JX 78.
[20] *Id.* at AR8.
[21] *Id.* at AR9.

take action with regard to the composition of [Cardio's] board of directors to poise [Cardio] for future success."[22]

The bankruptcy court granted the Trustee's Motion on November 18, 2013. The court's order indicated that:

> The Trustee is authorized to take the following actions which are consistent and fall within the Trustee's ordinary course duties under 11 U.S.C. § 704:
>
>> a. to vote the Vizier Investment Capital Limited ("Vizier") shares to serve as President and director of Vizier and take all actions attendant to serving as President and director . . . ; [and]
>>
>> b. to sell up to 2 million of the 19 million shares at a price of no less than $0.25 per share, provided any such sale shall include a commitment to add a Trustee appointed representative to the board of [Cardio], and the [Montano] Estate retains a right to repurchase the shares within 1 year of any public offering of such shares for 110% of the purchase price . . . .[23]

The Trustee noted in his declaration appended to the Motion that "$.25 per share . . . appears to be at least five times what the shares are currently worth," as well as his belief that the Interim Board on which the Defendants are not directors "provides the best opportunity for success of [Cardio] (because, in part, it will result in necessary funding to [Cardio]), and therefore it is in the best interest of the Estate to keep the [Interim] Board intact."[24]

---

[22] *Id.* at AR11.
[23] JX 84 at ¶ 2(a)-(b).
[24] JX 79 at ¶¶ 5, 7.

14

Wallen's November 11 proxy solicitation materials failed to describe negotiations—then well-advanced—leading up to the bankruptcy court's November 18 order or the resulting November 22 Stock Purchase Agreement between Wallen and the Trustee. Instead, with respect to that transaction, the proxy statement provided only that "[b]ased on the opinion of bankruptcy counsel, it is my belief that the Trustee, with the cooperation of Montano's ex-wife, has or will obtain the right to grant a proxy with respect to the shares held by [Vizier],"[25] and that "[i]t is anticipated that the Board might appoint one or two additional directors after these initial designations."[26] On November 15, 2013, Montano disseminated "proxy revocation" materials to the Cardio stockholders, "writing to explain the full facts of the matter, to tell [stockholders] what [Montano had] done for [Cardio], and to explain how [those] efforts are imminently poised to bring in millions of dollars in partnering agreements that will save the company without destroying the interests of the existing shareholders," and urging stockholders not to grant proxies in the Second Consent Action.[27] Montano did not describe the details of the Stock Purchase Agreement in those materials, although he had notice of, objected to, and appeared before the bankruptcy court to oppose the Trustee's November 8 Motion seeking approval of, that Agreement.

---

[25] JX 80 at 3.
[26] *Id.* at 8.
[27] JX 81 at 1.

*B. The Parties' Contentions*

The Defendants contend (1) that the transaction described above constitutes improper vote-buying, and (2) that because "Wallen had been negotiating (and was continuing to negotiate) to place a director designated by the Trustee on the [Cardio] board in connection with his purchase of [Cardio] stock, [and] he did not disclose that fact in [his proxy solicitation] materials,"[28] the Court should invalidate the transaction under *Portnoy v. Cryo-Cell International, Incorporated.*[29] The Plaintiff responds that (1) the Vizier proxy is not the result of improper vote-buying; (2) Montano acquiesced to the transaction in the bankruptcy court proceedings; (3) the proxy statement disclosed all it could have given that the parties were still in the process of negotiating the Stock Purchase Agreement when the solicitations were sent to stockholders; and (4) the failure to disclose the terms of the Stock Purchase Agreement does not result in the same unfairness present under the facts in *Portnoy*.

## II. STANDARD OF REVIEW

The Plaintiff brings this action to confirm the validity of the Second Consent Action pursuant to 8 *Del. C.* § 225, in accordance with which, "[u]pon application of any stockholder or director, or any officer whose title to office is contested, the Court of Chancery may hear and determine the validity of any election,

---

[28] Defs.' Op. Pre-Trial Br. at 14-15.
[29] 940 A.2d 43 (Del. Ch. 2008).

16

appointment, removal or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office . . . ."[30] Such a proceeding is summary in nature. Further, in a Section 225 action, "[t]he burden of proving that a director's removal is invalid rests with the party challenging its validity"[31]—here, the Defendants.

The Court conducted a one-day trial in this action on May 2, 2014. The following is my determination of the merits of the Section 225 dispute.

### III. ANALYSIS

The bedrock principles underlying our conception of corporate governance are that the directors run the corporation on behalf of the owners, the stockholders, who delegate power to the directors through the operation of the stockholder franchise. For this reason, both our statutory and common law are protective of the right of stockholders to vote, and by exercising that vote, to choose the directors. This Court can interfere with an effective operation of the franchise, in the consent arena, in two ways, both equally deleterious: by invalidating actions properly taken by consent; and by ratifying actions purportedly by consent, where those actions do not represent the will of the stockholders. I have already invalidated one purported vote to remove the Montano board, and I am therefore cognizant of the risk to exercise of the franchise in invalidating a second. Nonetheless, imposing the

---

[30] 8 *Del. C.* § 225(a).
[31] *Unanue v. Unanue*, 2004 WL 5383942, at *10 (Del. Ch. Nov. 9, 2004).

17

results of an uninformed vote is inimical to the exercise by the stockholders of their right to elect the board of directors. For the reasons that follow, the Plaintiff's request to ratify the results of the Second Consent Action must be denied.

The Defendants challenge the validity of the Second Consent Action on four grounds: they contend that (1) the Vizier proxy is invalid as vote-buying or due to inadequate disclosure of the Stock Purchase Agreement in the solicitation materials; (2) the electronic proxies are invalid as procedurally deficient; (3) the brokerage proxies from the proxy tabulating agency, Broadridge, are invalid as procedurally deficient; and (4) the Second Consent Action should be invalidated because the proxy solicitation materials contained materially misleading disclosures. I address only the Defendants' first contention, as well as outstanding requests for attorneys' fees, below.

### 1. Vote-Buying

The Defendants seek to (1) invalidate the Vizier proxy on the basis that Wallen and the Trustee's Stock Purchase Agreement constitutes impermissible vote-buying, or (2) invalidate the Second Consent Action in its entirety on the basis that, even if not impermissible vote-buying, the Stock Purchase Agreement was material such that its existence should have been disclosed to stockholders considering whether to execute a proxy.

18

In *Schreiber v. Carney*, this Court defined vote-buying as any "voting agreement supported by consideration personal to the stockholder, whereby the stockholder divorces his discretionary voting power and votes as directed by the offeror."[32] Although the Plaintiff suggests that the Stock Purchase Agreement did not by its express terms compel the Trustee to deliver a proxy in favor of the Second Consent Action, it is clear from the record before me that the Trustee's proxy was a vital part of that Agreement.[33] In other words, because I understand the transaction at issue involved the sale of both stock *and* a proxy, the Stock Purchase Agreement constituted vote-buying under the definition articulated in *Schreiber*. The mere existence of an agreement to vote shares in a particular way does not end the inquiry, however.

Under Delaware law, "an agreement involving the transfer of stock voting rights without the transfer of ownership is not necessarily illegal and each arrangement must be examined in light of its object or purpose."[34] In fact, under most circumstances, "[s]hareholders are free to do whatever they want with their votes, including selling them to the highest bidder."[35] However, "vote-buying is illegal *per se* if its object or purpose is to defraud or disenfranchise the other

---

[32] *Schreiber v. Carney*, 447 A.2d 17, 23 (Del. Ch. 1982).
[33] *See* JX 113 at 2014CVBT00003071 (indicating that the Trustee would vote "as requested"); *see also supra* note 11.
[34] *Schreiber*, 447 A.2d at 25.
[35] *Hewlett v. Hewlett-Packard Co.*, 2002 WL 549137, at *4 (Del. Ch. Apr. 8, 2002).

stockholders."[36]  In considering whether a vote-buying scheme has defrauded or disenfranchised the stockholders, our case law distinguishes between vote-buying agreements secured by corporate assets and assets owned by third parties. Accordingly, a third party is prohibited from buying votes only where doing so would be "disenfranchising" by "creat[ing] a misalignment between the voting interest and the economic interest of [the] shares."[37]  By contrast, even where economic interests remain aligned, "[m]anagement . . . may not use *corporate assets* to buy votes in a hotly contested proxy contest about an extraordinary transaction that would significantly transform the corporation, unless it can be demonstrated . . . that management's vote-buying activity does not have a deleterious effect on the corporate franchise."[38]

The Plaintiff suggests that, were I to evaluate the Stock Purchase Agreement as a third-party transaction, the Stock Purchase Agreement could not constitute impermissible vote-buying under the authorities cited above, as the Agreement did not misalign the Trustee's voting and economic interests as a fiduciary of Vizier. Specifically, the Plaintiff explains that, while the Trustee transferred to Wallen 1 million shares of Cardio from the Montano Estate, Vizier continued to hold an additional 29 million Cardio shares, and therefore retained a significant economic

---

[36] *Schreiber*, 447 A.2d at 24.
[37] *Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 377, 388 (Del. 2010).
[38] *Hewlett*, 2002 WL 549137, at *4 (emphasis added).

20

stake in the Company.[39] The alignment of interests relevant in a vote-buying analysis, however, is an alignment of a *vote-buyer's* interests upon the exercise of his vote, not of the *vote-seller's* interests upon forfeiture of his vote.[40] That is because "what legitimizes the stockholder vote as a decision-making mechanism is the premise that stockholders with economic ownership are expressing their collective view as to whether a particular course of action serves the corporate goal of stockholder wealth maximization."[41] In other words, where a party has no equity stake in the corporation, his vote distorts an effective exercise of the franchise, the ultimate goal of which is the financial success of the company for the stockholders' benefit. Accordingly, it is Wallen's equity interests, rather than the Trustee's, that are relevant to a third-party vote-buying analysis. Although Wallen maintains a significant debt and equity stake in the Company, it is not clear from the record before me to what extent those interests may be opposed. What is clear is that, independent of the vote-buying arrangement, Wallen has a significant economic interest in the success of Cardio, both as an equity-holder and as a creditor, and that if the Company fails under the management of the Montano slate, his interests will be extinguished as both shareholder and creditor. It is unlikely,

---

[39] Pl.'s Pre-Trial Answering Br. at 21.

[40] To the extent the Trustee's interests are relevant, he acted under a fiduciary duty to advance Vizier's interest, and only if he were near-indifferent to the Wallen and Montano slates would an ability to provide the Estate liquidity influence the Trustee's decision to favor Wallen's slate over Montano's.

[41] *Kurz v. Holbrook*, 989 A.2d 140, 178 (Del. Ch. 2010), *aff'd in part*, *rev'd in part sub nom. Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 377 (Del. 2010).

21

therefore, that the voting rights obtained pursuant to the Stock Purchase Agreement resulted in the agency problems that misalignment of incentives creates, and about which third-party vote-buying doctrine is concerned.

It is not clear to me, however, that the Stock Purchase Agreement at issue can rightly be characterized as a third-party transaction. While it is true that Wallen used his personal assets to purchase the 1 million Cardio shares from the Montano Estate, there remained another crucial term to be satisfied: the delivery of a board seat on Cardio's board of directors. Of course, Wallen could not deliver that seat on his own, and the Interim Board's legal counsel understood that under Delaware law, its fiduciary duties to the Cardio stockholders prevented it from entering into an enforceable agreement to deliver a seat to the Trustee's designee.[42] As a result, while Wallen contractually agreed only to use his "best efforts" to secure the seat, he assured the Trustee that the Interim Board saw no reason its fiduciary duties would prevent it from agreeing to the seat despite an inability to enter into an enforceable agreement to that effect.[43] Most revealingly, he demonstrated his absolute confidence that the board seat would be approved by

---

[42] *See* JX 86 at 6 (email from Barry Cannaday, counsel for the Plaintiff, to Justin Rawlins, counsel for the Trustee) ("Under Delaware law, the Cardio Board of Directors has a fiduciary duty to the shareholders to consider the qualifications of any proposed addition to the Board and to make an independent determination that it will be in the best interest of the shareholders of Cardio to appoint the person who is put up for a vacant position on the Board (which is what will happen here). They cannot agree in advance to simply appoint anyone the Trustee designates.").

[43] *See, e.g.*, *id.* at 2 (email from Cannaday, counsel for the Plaintiff, to Wallen, Gordon, and Flaa) ("I have asked that [the Trustee's counsel] provide [the Trustee's designee] Al Moran's resume, so that it can be determined that there is a legitimate basis for making this statement.").

22

agreeing to *forfeit his 1 million purchased shares*—while permitting the Trustee to retain the $250,000 consideration—if despite his best efforts, he proved unable to deliver the board seat. Wallen's own bankruptcy counsel, in communications with the Trustee's counsel, explained that Wallen's willingness to put $250,000 worth of shares on the line if the Interim Board did not approve the Trustee's designee demonstrated that Wallen was "willing to agree [only] because he [was] very comfortable that he [could] fulfill this obligation."[44] That confidence is unsurprising given that the Interim Board and Wallen's slate were identical.[45] And, of course, the Plaintiff's suggestion that the Trustee's board seat was not an essential term of the Stock Purchase Agreement is belied by the fact that the Trustee, despite selling the Estate's Cardio stock at five times its market value, initially considered the Interim Board's failure to agree to appoint his designee a "deal breaker."[46] Based on those considerations, it is conceivable that the Interim Board agreed to deliver a valuable corporate asset—a seat on the Cardio board—in exchange for the Trustee's proxy.

Ultimately, however, I need not determine whether the Stock Purchase Agreement constituted impermissible vote-buying. The Defendants contend that the Agreement, even if not impermissible vote-buying, was a material transaction,

---

[44] JX 113 at 3087.
[45] Both the Interim Board and Wallen's slate include Wallen, Flaa, Grant Gordon, Jon Ross, and Robert Schleizer. JX 80 at 7-8.
[46] JX 86 at 5.

23

and Wallen's failure to disclose it in his proxy solicitation materials provides a compelling basis to invalidate the Second Consent Action. For the reasons detailed below, I agree. Despite the Plaintiff's suggestion that no duty to disclose could be imputed to Wallen acting in his capacity as a stockholder, even acting in their individual capacities, directors owe a duty of candor to the stockholders of the corporation for which they serve,[47] and in any event, assuming the Interim Board's collusion with respect to the Stock Purchase Agreement, the Interim Board itself had a duty to update the stockholders regarding its participation in the transaction.

It is axiomatic that "directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[48] Information is material "if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote."[49] For the reasons that follow, I find that the promise to grant the Trustee's designee a seat on the Company's board in connection with the

---

[47] *See Zaucha v. Brody*, 1997 WL 305841, at *4-5 (Del. Ch. June 3, 1997) ("[The plaintiff] argues that he sought consents not as a director but as a stockholder. The statute does not limit the right to seek consents to stockholders. More fundamentally, fiduciary duties are not limited to the board as a body or to the controlling majority, but bind directors individually. . . . I see no sound reason to relieve a director of his fiduciary duty simply on the basis that he is acting in another capacity. One reason for the fiduciary duty of disclosure is directors' greater access to knowledge. A dissident director like [the plaintiff] has that knowledge no less when challenging controlling board members. Stockholders have a right to assume that directors always act in what they believe to be the stockholder's best interest, and I see no reason why that assumption should not apply to a dissident director who solicits stockholders' consents.").

[48] *Loudon v. Archer-Daniels-Midland* Co., 700 A.2d 135, 143 (Del. 1997) (internal quotation omitted) (citing *Arnold v. Society for Savs. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994)).

[49] *Id.*

Stock Purchase Agreement was material such that Wallen and the Interim Board had a duty to disclose its existence to the Cardio stockholders, either in Wallen's initial solicitation materials, or in a supplement to those materials.

Several factors, taken together, lead to my conclusion that the board seat secured by the Trustee pursuant to the Stock Purchase Agreement was information a stockholder would likely find material. In executing a proxy in favor of Wallen's Second Consent Action, the Cardio stockholders believed they were delivering proxies to remove six directors to be replaced by Wallen and his two designees, Jon Ross and Robert Schleizer. In reality, a proxy in support of the Second Consent Action effectuated the appointment not only of Wallen, Ross, and Schleizer, but of both the Trustee's designee, Moran, and an additional director to be designated by Wallen.[50] I find it likely that the Cardio stockholders would have found it material to know that, by delivering proxies in favor of the Second Consent Action, they were also supporting Moran's appointment to the Cardio board. Importantly, while the stockholders received written biographies on Flaa, Gordon, Wallen, Ross, and Schleizer in their proxy solicitation materials, they received no such information about Moran, and accordingly were denied any

---

[50] *See Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 73 (Del. Ch. 2008) (invalidating an election on the basis that "the disinterested Cryo-Cell electorate voted in ignorance of the actual board that would govern them in the event the Management Slate won").

25

opportunity to assess his credibility before delivering the proxies that would effectuate his appointment.[51]

Further, in addition to assessing Moran's credibility, the stockholders likely would have found the existence of the Stock Purchase Agreement relevant in assessing Wallen's credibility. Wallen has initiated two "successful" written consent actions that squeaked by with majority approval *only* by obtaining the support of a dispositive block of shares—the 30 million shares held by Vizier—in both cases by conduct that has fallen under scrutiny in this Court. Tellingly, the First Consent Action was invalidated because Vicki Montano, in response to a request by Wallen, executed a written consent on behalf of Vizier without authority to do so. While the proxy solicitation materials addressed that problem as if it were a technical error that had been corrected, in fact the success of the Second Consent Action still *required* that a proxy be delivered to Wallen on Vizier's behalf, and Wallen sought to secure the support of that dispositive block by promising its fiduciary's designee a seat on Cardio's board. Thus, to the extent stockholders read in the proxy solicitation materials that "it [was Wallen's] belief that the Trustee, with the cooperation of Montano's ex-wife, has or will obtain the

---

[51] *See id.* at 72 ("Problematically, the Cryo-Cell stockholders did not know that [the party to the vote-buying arrangement] clearly intended to designate [a particular designee], a person whose recent past would have weighed heavily on the mind of a rational stockholder considering whether to seat him as a fiduciary.").

right to grant a proxy with respect to the shares held by [Vizier],"[52] and rightly understood that statement to indicate that the primary concern in the first litigation—Vicki's authority to vote the Vizier shares—had been effectively resolved, stockholders would have found it an important clarification that the Trustee, though he had the *right* to grant the Vizier proxy, had at least in part determined to do so as a result of his bargained-for ability to fill a newly-created director seat. The relevant points here are that (1) in both the First and Second Consent Actions, even after securing the Vizier block, Wallen's slate was favored only by a narrow majority of shares,[53] and (2) stockholders would likely have found it material to know that the slate they were supporting felt it necessary to rely on the voting agreement described above in order to obtain the requisite number of proxies.

The Plaintiff contends that, even if the existence of the Stock Purchase Agreement was information material to the Cardio stockholders, Wallen could not possibly have disclosed its contents on November 11 when his proxy solicitation materials went sent, as the Agreement was not finalized until it was approved by the bankruptcy court on November 18 and executed on November 22.[54]  I find it

---

[52] JX 80 at 3.

[53] *See Portnoy*, 940 A.2d at 72 ("What [the party to the vote-buying agreement] did with his own bought shares is less the point than that the disinterested electorate voted in a razor-thin election without knowledge of very material facts.").

[54] The Plaintiff suggests that the existence of the Stock Purchase Agreement was publically available as it was approved in a public bankruptcy court proceeding and disclosed in Delaware

telling, however, that, despite his failure to describe the Stock Purchase Agreement even in the conditional, Wallen did find the transaction sufficiently likely such that it warranted the partial disclosure that "[i]t is anticipated that the Board might appoint one or two additional directors after these initial designations."[55] Moreover, the Plaintiff contends that an effective number of proxies were delivered five days *after* the Agreement was executed, on November 27; as the parties were on the cusp of an agreement since mid-November, Wallen should have provided a supplemental disclosure immediately upon execution of the Agreement. Even so, Wallen continued to accept proxies through January 2, and even then did not update his solicitation materials.[56]

Because I find that the Trustee's agreement to deliver its dispositive proxy in exchange for a seat on the Company's board was material information that should have been disclosed to the Cardio stockholders, I find it appropriate to invalidate the Second Consent Action. I do so despite Montano's failure to disclose the Stock

Supreme Court filings. Pl.'s Pre-Trial Op. Br. at 29. Though a diligent stockholder might have discovered the existence of the Stock Purchase Agreement by seeking out and reviewing those filings, as explained above, the Interim Board had a fiduciary duty to disclose all material information—including the existence and terms of the Agreement—in the proxy solicitation materials provided to stockholders; further, even the filings to which the Plaintiff refers did not disclose that the Agreement was supported by the Trustee's commitment to deliver a proxy on behalf of the Vizier stock supporting the Second Consent Action.

[55] JX 80 at 8.

[56] The Plaintiff also suggests that "[n]o improper vote buying could have occurred here, where a federal court explicitly sanctioned the transaction and, further, directed the Trustee be given the ability to appoint a board representative." Pl.'s Pre-Trial Op. Br. at 23. That the bankruptcy court determined that approval of the Stock Purchase Agreement was appropriate under the U.S. Bankruptcy Code has no bearing on whether disclosure of that Agreement was material as a matter of Delaware corporate law.

Purchase Agreement in his own solicitation, which failure in no way justifies depriving the Cardio stockholders of material information to which they should have access when comparing the competing Montano and Wallen slates.

For almost twelve months, since June 2013, the Cardio stockholders have had no certainty regarding who constitutes the Company's proper board of directors. Even prior to the First Consent Action, Cardio had not held an annual election since 2008,[57] despite the requirements of the DGCL and in the Company's bylaws that a director election be held annually.[58] Significantly, were I to invalidate the Second Consent Action and do no more, the Defendants would return to positions on the Cardio board to which they were last elected *more than five years ago*. Clearly, both Montano and Wallen believe that, in the right hands, this struggling pharmaceutical company will eventually return value to its stockholders, but without a board able to negotiate agreements to sell its drug candidates, this company will at best continue on the brink of insolvency. Therefore, rather than simply invalidating the Second Consent Action, I find that an appropriate resolution of this action requires ordering an annual election

---

[57] Montano Dep. (July 12, 2013) 303:2-3.

[58] *See* Bylaws § 3.3 ("Except as provided in Section 3.4 of these Bylaws [governing resignations and vacancies], directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting. Each director, including a director elected or appointed to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified.").

pursuant to Section 225(a).[59]  A special master shall be appointed by this Court to oversee the election.  The Cardio stockholders are entitled to certainty and to a process free of the irregularities that have tainted the First and Second Consent Actions over the last twelve months, as well as a board that can manage with certainty the few assets of the Company that remain.

## 2. Requests for Attorneys' Fees

Three issues remain to be decided in this action and in the earlier-filed action, Civil Action No. 8632-VCG.  Those issues include (1) a request by the Defendants for attorneys' fees in connection with their Motion to Compel; (2) the Defendants' Motion for Sanctions seeking attorneys' fees for responding to the Plaintiff's Motion for Relief from the Status Quo Order; and (3) the Defendants' Motion to Hold the Interim Board in Contempt for Violating the Status Quo Order.

---

[59] *See* 8 *Del. C.* § 225(a) ("Upon application of any stockholder or director, or any officer whose title to office is contested, the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office, and, in case any such office is claimed by more than 1 person, may determine the person entitled thereto; *and to that end make such order or decree in any such case as may be just and proper* . . . .  In case it should be determined that no valid election has been held, the Court of Chancery may order an election to be held in accordance with § 211 or § 215 of this title.") (emphasis added); *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 83 n.208 (Del. Ch. 2008) (ordering an election to be overseen by a special master, noting that "[t]he DGCL gives this court wide discretion to craft a remedy in the case of a tainted election," and citing both Section 225(a) and Section 227(b)); *Magill v. N. Am. Refractories Co.*, 129 A.2d 411, 413 (Del. Ch. 1957) ("We think that under our statute the reviewing court, which must make 'such order or decree in any such case as may be just and proper,' is given a discretion to determine whether a new election should be ordered.") (citation omitted).

With respect to the Defendants' requests for attorneys' fees in connection with defending against the Plaintiff's earlier-filed Motions, that request is denied. I find that while the parties aggressively litigated this action, neither party's conduct rose to a level of bad faith sufficient to trigger an exception to the American Rule on fees. Specifically, in connection with the Defendants' Motion to Compel, I find that the Plaintiff's opposition was substantially justified, particularly in light of the over-breadth of the Defendants' request. Further, with respect to the Defendants' request for attorneys' fees for responding to the Plaintiff's Motion for Relief from the Status Quo Order, I find that such fees are not warranted as it does not appear that the Plaintiff acted in bad faith in pursuing that Motion. Accordingly, the parties shall bear their own fees in connection with those Motions.

As to the Defendants' Motion to Hold the Interim Board in Contempt for Violating the Status Quo Order, that Motion is also denied, to the extent that it is not moot in light of this Memorandum Opinion. Without addressing whether the Plaintiff violated the spirit of the Status Quo Order by initiating the Second Consent Action, I find that the relief the Defendants request—declaring written consents delivered in the Second Consent Action ineffective, dissolving the Status Quo Order, and awarding the Defendants attorneys' fees—are either inappropriate or moot at this juncture.

## IV. CONCLUSION

For the reasons stated above, I find the Second Consent Action ineffective to remove the Defendants from the Cardio board of directors, but order the Company to hold, as soon as is convenient, an annual election, to be overseen by a special master appointed by the Court. The parties should submit an appropriate Order.